**In the Interest of V.C.,**
**a Minor, Appellee**

**Appeal of V.C., A Minor.**

Superior Court of Pennsylvania.

Submitted March 11, 2013.
Filed April 4, 2013.
Reargument Denied June 11, 2013.

Karl Baker, Public Defender, Philadelphia, for appellant.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., WECHT, J., and COLVILLE, J.*

OPINION BY STEVENS, P.J.

V.C., a minor, appeals from the dispositional order entered in the Court of Common Pleas of Philadelphia County, Juvenile Division, following his adjudication of delinquency for acts constituting a violation of 18 Pa.C.S.A. § 3701(a)(ii) (robbery), 18 Pa.C.S.A. § 3921(a) (theft by unlawful taking), 18 Pa.C.S.A. § 3925(a) (receiving stolen property), and 18 Pa.C.S.A. § 903 (conspiracy) in connection with the armed robbery of Shirley Phillips, and for acts constituting a violation of 18 Pa.C.S.A. § 2502(b) (second-degree murder), 18 Pa.C.S.A. § 3701(a)(1)(i) (robbery), and 18 Pa.C.S.A. § 903 (conspiracy) in connection with the shooting death of George Greaves. V.C. challenges the sufficiency of the evidence supporting his adjudication of delinquency as to Mr. Greaves, and he contends the juvenile court should have suppressed the statements he made to the police. We affirm.

■ The relevant facts and procedural history are as follows: Following his arrest in connection with the robbery of Shirley Phillips and the shooting death of George Greaves,[1] on August 22, 2011, V.C. filed a counseled motion seeking to sup-

---

* Retired Senior Judge assigned to the Superior Court.

1. Two separate delinquency petitions were filed against V.C.: One in connection with the robbery of Ms. Phillips, which was docketed in the juvenile court at CP–51–JV–0003667–2011, and one in connection with the shooting death of Mr. Greaves, which was docketed in the juvenile court at CP–51–JV–0003668–

press, *inter alia,* the statements he made to the police. The matter proceeded to a hearing at which Police Officer Jacqueline Speaks, Detective Henry Glenn, and Detective James Pitts testified. Specifically, Officer Jacqueline Speaks testified that, at approximately 3:00 p.m. on August 18, 2010, she received a dispatch to report to Pickering Street for a shooting. N.T. 9/20/11 at 17–18. When she arrived on location, she discovered the deceased victim, who was later identified as eighty-seven-year-old George Greaves, and she began the homicide investigation. N.T. 9/20/11 at 18. Officer Speaks spoke to Kathy Mathis, who lived in the neighborhood. N.T. 9/20/11 at 21–22. Ms. Mathis reported hearing two gunshots and immediately seeing a young, black male and a young, black female, who was wearing a Muslim headpiece, running from the scene. N.T. 9/20/11 at 22–25. During the investigation of the shooting, Officer Speaks received flash information about a robbery, which had occurred about forty minutes prior to and ten blocks from the shooting. N.T. 9/20/11 at 25–30. The flash information provided a description of the robbery suspects similar to the description Ms. Mathis had provided for the two people she saw running from the shooting scene. N.T. 9/20/11 at 26.

A few days after the robbery and subsequent shooting, on August 20, 2010, Officer Speaks responded to V.C.'s residence for a "priority radio call" of someone "screaming for help." N.T. 9/20/11 at 34. Inside the residence, she found V.C.'s mother screaming and crying. N.T. 9/20/11 at 36–37. V.C.'s mother repeatedly said, "Ah, the streets got him. He's gone, and I done did everything I could do[.]" N.T. 9/20/11 at 37–38. Officer Speaks asked V.C.'s mother to calm down and asked her why she was upset. N.T. 9/20/11 at 40–41.

V.C.'s mother continued crying and screaming, and Officer Speaks eventually asked V.C.'s mother to accompany her to the police station, a request to which V.C.'s mother complied. N.T. 9/20/11 at 44. During the drive to the police station, V.C.'s mother continued crying and said, "Ah, the streets got him. I can't believe he's with that young lady. She be in my house still." N.T. 9/20/11 at 46. Officer Speaks asked V.C.'s mother about whom she was talking, and she said the girl was about V.C.'s age, sneaking in the window at night, and had stolen some of her clothes, including her Muslim headpiece. N.T. 9/20/11 at 45–46. V.C.'s mother said, "I just can't believe it. I give him money every month to buy clothes. The streets have got him. They just got my son. I can't believe it. I tried everything. I do everything for my kids." N.T. 9/20/11 at 46.

Detective Henry Glenn testified he was assigned to investigate the shooting of Mr. Greaves, and he was aware of the armed robbery, which occurred approximately ten blocks away from and prior to the shooting of Mr. Greaves. N.T. 9/20/11 at 69–71. He was aware that a similar description of two youths had been provided for both crimes. N.T. 9/20/11 at 72–79.

On August 20, 2010, at the police station, Detective Glenn interviewed V.C.'s mother to determine why she was upset. N.T. 9/20/11 at 79. V.C.'s mother told him V.C. was "hanging around with a girl, she knew whose first name was India." N.T. 9/20/11 at 80. The detective showed her photographs, and V.C.'s mother identified one of the photographs as being the "India" V.C. was "hanging out with." N.T. 9/20/11 at 80. Suspecting V.C. was the young male involved with the August 18, 2010 robbery and shooting, Detective Glenn told V.C.'s

2011. The petitions were consolidated in the juvenile court.

mother he wanted to speak with V.C. N.T. 9/20/11 at 80.

The next morning, he and two plain-clothes officers went to the residence in an unmarked police car. N.T. 9/20/11 at 90–91. V.C.'s mother reported V.C. was not at home, and therefore, the police officers drove around the area until they saw V.C. walking down the block near his house. N.T. 9/20/11 at 80–81. The police stopped V.C., who then knocked on the front door of his residence to alert his mother she was needed on the front porch. N.T. 9/20/11 at 81. V.C.'s mother came outside and asked V.C. to tell the police where India lived. N.T. 9/20/11 at 81. V.C. indicated he did not know her exact address. N.T. 9/20/11 at 81. At this time, the uniformed officers transported V.C. to the homicide unit, while the detectives gave V.C.'s mother a ride to the unit.

On cross-examination, Detective Glenn indicated V.C. was not handcuffed; however, he would not have been free to leave the police vehicle if he had attempted to do so. N.T. 9/20/11 at 92. At the homicide unit, V.C. and his mother were reunited in the lobby, and within approximately fifteen minutes, the detectives interviewed V.C. N.T. 9/20/11 at 102–103.

Detective James Pitts testified he and his partner, Detective Ohmarr Jenkins, interviewed V.C. with his mother present at the homicide unit. N.T. 9/20/11 at 119–121. Prior to questioning, the detectives read V.C. his Miranda[2] warnings, and V.C. signed a paper indicating he understood and waived his rights. N.T. 9/20/11 at 121. V.C. then provided the detectives with a verbal statement, which the police typed and V.C. and his mother signed. N.T. 9/20/11 at 121–125. Detective Pitts testified V.C.'s mother was present when V.C., in his own words, told the detectives what had occurred with regard to the robbery and shooting; however, she left the room from time to time when the police began a question and answer period in response to V.C.'s statement. N.T. 9/20/11 at 128–130. Detective Pitts testified V.C. told the police India shot an old man. N.T. 9/20/11 at 133. Specifically, V.C. made, in relevant part, the following statement:

> Me and India were walking up the driveway. I was listening to my Ipod, and we saw the man working in the back of his house. India stopped and started looking at the man so I stopped and looked at her, took my Ipod off and asked her, "What?" She said, "I'm about to do this." I said, "Do what?" And she was like, "I'm gonna rob this guy." I told her "Come on you've done enough for today. I've never known you to do stuff like this. Let's just go." Then she said, "This is the last one." And she started walking over to him. When she went over to him, I looked both ways up the driveway to make sure nobody was out there. I heard her say, "Give it up!" And I looked at them and I could see that he tried to push her away. I looked both ways up the driveway again to make sure wasn't nobody coming and I heard the gunshot. I just ran around to the corner and made a right. Then I looked back and saw India was running too. Then I let her lead the way, and we kept running. I don't know the streets up there like that but we ended up on Vernon Road, and went to her house. Then she went in the house and I went home.

N.T. 9/20/11 at 134–135.

V.C. denied taking anything from the older man. N.T. 9/20/11 at 135. When asked what he meant when he said to

---

**2.** Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

India, "you've done enough for today," V.C. clarified India "had already robbed [a] lady." N.T. 9/20/11 at 136. With regard to the robbery, V.C. made the following relevant statement:

> We were walking up Rugby and everything was normal and India was in front of me. The lady was toward us and then [she] just pulled out her gun and robbed the lady. She took her purse. I wasn't expecting it so I asked her, "What are you doing?" She told me to shut up and kept doing what she was doing. She doesn't listen she's the type of person who does what she wants.

N.T. 9/20/11 at 136.

V.C. admitted to Detective Pitts that, when he discovered Mr. Greaves had died and the police wanted to speak to him, he "called [his] friend Daron and told him that if any police asked [to] tell them that [he] was with him all day two days ago." N.T. 9/20/11 at 137. Detective Pitts denied that, during the statement, either V.C. or his mother wanted V.C. to stop talking. N.T. 9/20/11 at 138.

On cross-examination, Detective Pitts testified that, upon arrival at the homicide unit, V.C. and his mother sat in the waiting room on a bench; however, after they were taken to a room, they were not left alone to confer without the police present. N.T. 9/20/11 at 140–144. After the detectives provided V.C. with his *Miranda* warnings, they invited V.C. and his mother to discuss whether V.C. should make a statement; however, the detectives did not leave the room. N.T. 9/20/11 at 140.

At the conclusion of all testimony, the juvenile court denied V.C.'s motion to suppress, and on September 20, 2011, represented by counsel, V.C. proceeded to an adjudication hearing at which the parties stipulated to the inclusion of the testimony and evidence from the suppression hearing. Additionally, Shirley Phillips and Ka-

thy Mathis testified. Specifically, Shirley Phillips testified that, on August 18, 2010, at approximately 3:00 p.m., she was walking to a bus stop on the 7800 block of Rugby Street when she saw V.C. walking "side by side" with a young woman. N.T. 9/20/11 at 39–40. As the duo began to pass by her, Ms. Phillips looked up and saw "a gun in [her] face." N.T. 9/20/11 at 39. The young woman, who was wearing Muslim garb, held the gun and said, "Give me your stuff." N.T. 9/20/11 at 39, 45. In response, Ms. Phillips dropped her purse and ran. N.T. 9/20/11 at 45–47. Ms. Phillips heard the young woman tell V.C. to get Ms. Phillips' TransPass, which Ms. Phillips was wearing around her neck, and V.C. began to chase Ms. Phillips. N.T. 9/20/11 at 47. Ms. Phillips took the TransPass off her neck and threw it to the ground, continuing to run. N.T. 9/20/11 at 48. She then turned around to determine whether the young woman was going to shoot her in the back and she saw V.C. reaching down in the area where she had dropped her TransPass. N.T. 9/20/11 at 48.

Ms. Mathis, whose home was located three homes away from George Greaves' home, testified that, on August 18, 2010, she saw Mr. Greaves mowing his lawn, and later that day, at approximately 3:40 p.m., while she was in her home, she heard gunshots. N.T. 9/20/11 at 11–13, 24. She immediately ran outside and saw a young man and woman running together past her home. N.T. 9/20/11 at 13–15, 35. The young man stopped to pull up his pants and looked directly at her. N.T. 9/20/11 at 14–16. When the young man stopped, so did the young woman, who Ms. Mathis described as "chunky, brown-skinned" and wearing Muslim garb on her head. N.T. 9/20/11 at 17, 35. Ms. Mathis clarified the young woman's face was not covered and she was wearing jeans. N.T. 9/20/11 at

17–18. She testified that, prior to August 18, 2010, she had never seen the young man or young woman; however, in court, Ms. Mathis identified V.C. as the young man she saw running past her home on the date in question. N.T. 9/20/11 at 14–15, 24. After emergency personnel responded, Ms. Mathis realized Mr. Greaves had been shot. N.T. 9/20/11 at 26–27.

At this point, the parties stipulated that, if called to testify, Dr. Edward Lieberman, who is an assistant medical examiner, would have testified Mr. Greaves died from a gunshot wound to his left chest. N.T. 9/20/11 at 64–65. Additionally, the parties stipulated that, if called to testify, V.C.'s paternal grandmother, mother, stepfather, and brother would testify as to V.C.'s peaceful, honest, and law-abiding reputation. N.T. 9/20/11 at 72–73.

At the conclusion of all evidence, the juvenile court adjudicated fourteen-year-old V.C. delinquent of robbery, theft by unlawful taking, receiving stolen property, and conspiracy as to Shirley Phillips. The juvenile court also adjudicated V.C. delinquent of second-degree murder, robbery, and criminal conspiracy as to George Greaves. Following a hearing, by order entered on October 6, 2011, the juvenile court committed V.C. to George Junior Republic Intensive Supervision for a minimum of two years.[3] This timely appeal

followed, and all Pa.R.A.P. 1925 requirements have been met.

■ V.C.'s first contention is the evidence was insufficient to sustain his adjudication of delinquency as to the acts committed against Mr. Greaves.[4] Specifically, he contends there was insufficient evidence he conspired with India Spellman to rob or shoot Mr. Greaves, and therefore, the evidence was insufficient to support his adjudication of delinquency for any acts committed against Mr. Greaves.[5] In essence, V.C. argues the evidence establishes he was "merely present" as a young, innocent bystander who, in fact, attempted to talk Ms. Spellman out of robbing Mr. Greaves. We find no merit to his contention.

In evaluating a challenge to the sufficiency of the evidence supporting an adjudication of delinquency, our standard of review is as follows:

When a juvenile is charged with an act that would constitute a crime if committed by an adult, the Commonwealth must establish the elements of the crime by proof beyond a reasonable doubt. When considering a challenge to the sufficiency of the evidence following an adjudication of delinquency, we must review the entire record and view the evidence in the light most favorable to the Commonwealth.

In determining whether the Commonwealth presented sufficient evidence to

---

3. V.C.'s seventeen-year-old co-conspirator, India Spellman, was tried as an adult and convicted of, *inter alia*, robbery and second-degree murder in connection with the crimes against Ms. Phillips and Mr. Greaves. As of the writing of this decision, she is awaiting sentencing in the lower court.

4. V.C. admits the Commonwealth proved he participated in the robbery of Shirley Phillips, and he has set forth no argument challenging the sufficiency of the evidence as to his adjudication of delinquency for robbery, theft by unlawful taking, receiving stolen property,

and conspiracy in connection with the acts against Ms. Phillips.

5. V.C. has set forth no separate sufficiency argument for the acts of second-degree murder and robbery; but rather, his argument suggests that, if the evidence sufficiently supports his adjudication of delinquency for conspiracy in this regard, then the evidence was sufficient as to all acts committed against Mr. Greaves. We shall equally confine our analysis. *See Commonwealth v. Cousar*, 593 Pa. 204, 928 A.2d 1025 (2007).

meet its burden of proof, the test to be applied is whether, viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences therefrom, there is sufficient evidence to find every element of the crime charged. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by wholly circumstantial evidence.

The facts and circumstances established by the Commonwealth need not be absolutely incompatible with a defendant's innocence. Questions of doubt are for the hearing judge, unless the evidence is so weak that, as a matter of law, no probability of fact can be drawn from the combined circumstances established by the Commonwealth.

*In re A.V.*, 48 A.3d 1251, 1252–1253 (Pa.Super.2012) (quotation omitted).

■ A juvenile may be adjudicated delinquent of conspiracy if the Commonwealth sufficiently proves the elements set forth in 18 Pa.C.S.A. § 903, which provides, in relevant part, the following:

A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903(a).

This requires proof that: 1) the [juvenile] entered into an agreement with another to commit or aid in the commission of a crime; 2) he shared the criminal intent with that other person; and 3) an overt act was committed in furtherance of the conspiracy. "This overt act need not be committed by the [juvenile]; it need only be committed by a co-conspirator." *Commonwealth v. Murphy*, 795 A.2d 1025, 1038 (Pa.Super.2002) (citation omitted).

The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Therefore, [an adjudication of delinquency] for conspiracy requires proof of the existence of a shared criminal intent. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators in furtherance of the conspiracy.

*Commonwealth v. Knox*, 50 A.3d 749, 755 (Pa.Super.2012) (quotation and citations omitted).

■ V.C. is correct that "mere presence at the scene of a crime and knowledge of the commission of criminal acts is not sufficient [to establish a conspiracy]. Nor is flight from the scene of a crime, without more, enough." *Knox*, 50 A.3d at 756 (quotation omitted). However,

such factors, combined with other direct or circumstantial evidence, may provide sufficient evidence sustaining an adjudication of delinquency for conspiracy. *See Knox, supra.*

Here, viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, the evidence is sufficient to sustain V.C.'s adjudication of delinquency for conspiracy as to the acts committed against Mr. Greaves. For instance, the record reflects V.C. and Ms. Spellman were well acquainted with each other, and, in fact, Ms. Spellman was wearing V.C.'s mother's Muslim headpiece on August 18, 2010. On this day, as V.C. admits on appeal, he participated with Ms. Spellman in the armed robbery of Ms. Phillips. *See* V.C.'s brief at 12. After the robbery, V.C. did not leave Ms. Spellman's company; but rather, within an hour, by his own confession made to police, he walked with Ms. Spellman until they saw a man working outside. Ms. Spellman told V.C. she was going to rob the man, who was later identified as Mr. Greaves, and while she approached the man with her gun drawn, V.C. stood nearby, looking up and down the driveway to make sure no one was else was outside or "coming." N.T. 9/20/11 at 134–135. After Ms. Spellman shot Mr. Greaves, V.C. and Ms. Spellman ran together away from the scene, and V.C. admitted to police he followed Ms. Spellman, permitting her to "lead the way." N.T. 9/20/11 at 134–135. V.C. additionally admitted to police that, when he discovered Mr. Greaves had died and the police wanted to speak to him, he called his friend, Daron, and asked him to say that they were together on the day of the murder. N.T. 9/20/11 at 137.

Taken as a whole, we agree with the juvenile court there was ample evidence demonstrating V.C. entered into an agreement with Ms. Spellman to commit a criminal act and he shared the criminal intent with Ms. Spellman. *See Knox, supra.* Specifically, V.C. was not an "innocent bystander;" but rather, he was an active participant.[6] Thus, he was liable for all acts committed in furtherance of the conspiracy, including the armed robbery and murder of Mr. Greaves. *See id.* Therefore, we find no merit to his first contention.

■ V.C.'s second contention is the juvenile court erred in denying the motion to suppress his confession, which he made to the police. Specifically, V.C. suggests he did not voluntarily waive his *Miranda* rights in light of the fact he was only fourteen years old, he had no prior contact with the criminal justice system, his mother was mentally unstable so as to be incapable of acting in V.C.'s best interest, and the police did not provide adequate opportunity for V.C. and his mother to consult about V.C. waiving his rights without the police present.

■ Our standard of review in considering an order denying a suppression motion is as follows:

An appellate court may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, the appellate court is bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. It is also well settled that the appellate court is not bound by the suppression

---

**6.** We note the juvenile court, as finder of fact, was free to reject V.C.'s self-serving statement indicating he attempted to dissuade Ms. Spellman from committing the acts against Mr. Greaves. *In re A.V., supra.*

court's conclusions of law. However, [w]hether a confession is constitutionally admissible is a question of law and subject to plenary review.

Thus, this Court does not, nor is it required to, defer to the suppression court's legal conclusions that a confession or *Miranda* waiver was knowing or voluntary. Instead, we examine the record to determine if it supports the suppression court's findings of fact and if those facts support the conclusion that, as a matter of law, [the juvenile] knowingly and intelligently waived his *Miranda* rights.

*Knox,* 50 A.3d at 746 –747 (citations and quotations omitted).

■■■■ With regard to a juvenile waiving his *Miranda* rights, we preliminarily note:

Regardless of whether a waiver of *Miranda* is voluntary, the Commonwealth must prove by a preponderance of the evidence that the waiver is also *knowing and intelligent.*

*Miranda* holds that "[t]he [juvenile] may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice

and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived.

A determination of whether a juvenile knowingly waived his *Miranda* rights and made a voluntary confession is to be based on a consideration of the totality of the circumstances, including a consideration of the juvenile's age, experience, comprehension, and the presence or absence of an interested adult. In examining the totality of circumstances, we also consider: (1) the duration and means of an interrogation; (2) the defendant's physical and psychological state; (3) the conditions attendant to the detention; (4) the attitude of the interrogator; and (5) "any and all other factors that could drain a person's ability to withstand suggestion and coercion." "[W]e acknowledge that the *per se* requirement of the presence of an interested adult during a police interview of a juvenile is no longer required. Nevertheless, it remains one factor in determining the voluntariness of a juvenile's waiver of his *Miranda* rights."

*Knox,* 50 A.3d at 746–747 (quotations and citations omitted) (italics in original).

■■■ Here, in finding V.C. voluntarily, knowingly, and intelligently waived his *Miranda* rights prior to confessing to the detectives,[7] the juvenile court stated, in relevant part, the following:

The totality of the circumstances in the present case includes the short duration of the interview with Homicide Detective Pitts. Detective Pitts started his interview of [V.C.] at 2:40 PM and it was concluded at 4:15 PM. Furthermore, there were no allegations of any physi-

---

7. It is well settled that *Miranda* is not implicated unless the individual is in custody and subjected to interrogation. *Commonwealth v. Snyder,* 60 A.3d 165 (Pa.Super.2013). In this

case, we shall assume, *arguendo,* that V.C. was subjected to custodial interrogation when he confessed.

cal, verbal or psychological intimidation by Homicide Detective Pitts or any allegations or evidence presented to suggest that [V.C.] possessed a diminished mental capacity. To the contrary, [V.C.] had the opportunity to speak with his mother prior to the interview. Homicide Detective Pitts advised [V.C.] of his Miranda rights and [V.C.] completed a written waiver that he signed along with his mother. Moreover, [V.C.'s] mother was present throughout the interview process and she initialed and signed [V.C.'s] Statement after Detective Pitts concluded the interview. In addition, there were no allegations or evidence presented to [the juvenile] court to allow it to find that the condition of [V.C.'s] questioning at Homicide Headquarters or the manner in which the interview was conducted suggested that [V.C.] had been coerced to give a confession. All of the facts surrounding the manner in which Detective Pitts obtained [V.C.'s] confession all support the voluntariness of the confession and a knowing and intelligent waiver of [V.C.'s Miranda rights].

Juvenile Court's Opinion filed 6/28/12 at 24–25.

We find no abuse of discretion in this regard. *Knox, supra.* Additionally, we note the record reveals V.C. and his mother spent approximately fifteen minutes in a waiting area prior to the detectives' questioning of V.C. such that they were certainly free to discuss whether V.C. should make a statement to the police. Moreover, the record reveals V.C. was in the ninth grade, able to read, and not under the influence of drugs or alcohol. Further, contrary to V.C.'s suggestion, there is no evidence his mother, who was present during V.C.'s waiver of his *Miranda* rights and the majority of the interview, was mentally unstable. Rather, the evidence tended to show she was understandably extremely upset at the prospect her son, V.C., had participated in a robbery and homicide. In any event, as indicated *supra,* the presence of a mentally firm parent would be just one factor to consider in whether V.C.'s waiver of his *Miranda* rights was voluntary, knowing, and intelligent. *See Knox, supra.*

For all of the foregoing reasons, we affirm.

Affirmed.