J-A03038-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.R., A MINOR | : | No. 2684 EDA 2014 |

Appeal from the Dispositional Order August 15, 2014
In the Court of Common Pleas of Lehigh County
Juvenile Division at No(s): CP-39-JV-0000318-2014

BEFORE:  GANTMAN, P.J., MUNDY J., and DUBOW, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED MARCH 30, 2016**

Appellant, J.R., appeals from the dispositional order entered in the Lehigh County Court of Common Pleas, following his adjudication of delinquency for three counts of indecent assault.[1]  We affirm.

In its opinion, the juvenile court fully and correctly sets forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.  We add only that the court denied Appellant's suppression motion on July 22, 2014, and adjudicated Appellant delinquent on three counts of indecent assault.  The court imposed juvenile probation on August 15, 2014, until further notice of the court.  On September 11, 2014, Appellant timely filed a notice of appeal.  The court ordered Appellant on September 16, 2014, to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).  The court granted Appellant's

_____

[1] 18 Pa.C.S.A. § 3126.

request for an extension of time, and Appellant timely filed his Rule 1925(b)

statement on October 31, 2014.

Appellant raises the following issue for our review:

> WHETHER THE [JUVENILE] COURT ERRED IN FAILING TO
> GRANT APPELLANT'S MOTION TO SUPPRESS STATEMENTS
> WHERE APPELLANT'S WAIVER OF HIS **MIRANDA** RIGHTS
> WAS INVOLUNTARY, UNKNOWING, AND/OR
> UNINTELLIGENT IN THAT IT WAS MADE WITHOUT A FULL
> AWARENESS OF THE RIGHTS BEING ABANDONED AND/OR
> CONSEQUENCES OF GIVING UP THOSE RIGHTS?

(Appellant's Brief at 5).

We review the denial of a suppression motion as follows:

> Our standard of review in addressing a challenge to a
> [juvenile] court's denial of a suppression motion is limited
> to determining whether the factual findings are supported
> by the record and whether the legal conclusions drawn
> from those facts are correct.
>
> > [W]e may consider only the evidence of the
> > prosecution and so much of the evidence for the
> > defense as remains uncontradicted when read in the
> > context of the record as a whole. Where the record
> > supports the findings of the suppression court, we
> > are bound by those facts and may reverse only if the
> > court erred in reaching its legal conclusions based
> > upon the facts.

**Commonwealth v. Williams**, 941 A.2d 14, 26-27 (Pa.Super. 2008) (*en*

*banc*) (internal citations and quotation marks omitted). "It is within the

suppression court's sole province as factfinder to pass on the credibility of

witnesses and the weight to be given their testimony." **Commonwealth v.**

**Clemens**, 66 A.3d 373, 378 (Pa.Super. 2013) (quoting **Commonwealth v.**

**Gallagher**, 896 A.2d 583, 585 (Pa.Super. 2006)).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Kelly L. Banach, we conclude Appellant's issue merits no relief. The juvenile court's opinion comprehensively discusses and properly disposes of the question presented. (*See* Juvenile Court Opinion, filed July 22, 2014, at 7-9) (finding: Detective contacted Appellant's stepmother, who confirmed Appellant's uncle and family friend could act as interested adults on Appellant's behalf; stepmother permitted detective to speak with Appellant in presence of uncle and family friend; prior to Appellant's interview, Detective spoke with uncle and family friend outside interview room and discussed nature of incidents that led to Appellant's questioning; Detective showed uncle and family friend photo of Appellant on city surveillance system; tone of interview was conversational, as Appellant requested to speak with Detective outside presence of uncle and family friend, and disclosed information unknown to police; Detective gave Appellant *Miranda* waiver form, explained that form was given to all juveniles to read and consider, and that form contained Appellant's rights; Detective told Appellant to discuss waiver form with his uncle and family friend, and indicated where to sign; court reviewed audio/videotape of interview, which showed Appellant's family friend holding waiver form and reading it aloud in Spanish; court also observed Appellant's uncle sign waiver form; Appellant's uncle gave Detective permission to speak with Appellant alone, as

Appellant's stepmother authorized Appellant's uncle to act as "parent"; Detective told Appellant he could stop talking to Detective and speak with his uncle at any time; Appellant's uncle and family friend were interested and informed adults; Appellant's uncle read and voluntarily signed **Miranda** waiver form; audio/videotape of police interview and Detective's testimony at suppression hearing showed Appellant understood and comprehended questions posed to him in interview, and appropriately responded to questions). The record supports the court's decision; therefore, we have no reason to disturb it. Accordingly, we affirm on the basis of the juvenile court's opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/30/2016

IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
JUVENILE DIVISION

In Re: J.M.R.

No. 2014-423
CP-39-JV-318-2014

**OPINION**

**KELLY L. BANACH, J.:**

A Motion to Suppress was filed in the above-captioned matter on June 4, 2014. In said Motion, the Juvenile sought to suppress the statement he gave to Detective John Buckwalter of the Allentown Police Department during a custodial interview on May 9, 2014. On June 6, 2014, the Court schedule did not permit the Motion to be heard and the matter was rescheduled to June 12, 2014. On June 10, 2014, counsel for the Juvenile filed an Amended Motion to Suppress. In said Motion, the Juvenile sought to suppress the statement made to Detective Buckwalter, alleging that it was not voluntary inasmuch as it was not knowingly and intelligently given because a) he was not informed of the nature of the charges prior to being interviewed; and b) the totality of the circumstances surrounding the interview demonstrates that he did not have a "substantive understanding of the warnings given to him, the nature of his Fifth Amendment rights, or the consequences of waiving those rights." Juv. Amend. Mot. to Suppress, June 10, 2014, ¶10.

On June 12 and June 17, 2014, the Court heard the Juvenile's Motion to Suppress, including testimony and arguments of counsel. At the conclusion of the June 17, 2014 Hearing, the parties were permitted to submit Briefs relevant to the

Motion to Suppress by July 1, 2014 and the Court took the matter under advisement. Briefs were timely submitted and this Opinion follows.

## SUMMARY OF THE FACTS

On April 30, May 5, and May 8, 2014, the Allentown Police Department received reports of a juvenile actor wearing a school uniform (blue blazer with an emblem) attacking women in Center City Allentown. Investigation led the police to determine that the school uniform was that of the Roberto Clemente Charter School, located in Allentown. Police city camera footage was obtained and the Juvenile, J.M.R., was identified as the juvenile actor on the video.

On May 9, 2014, Detective John Buckwalter of the Allentown Police Special Victims Unit called J.M.R.'s residence. An individual identified himself as J.M.R.'s uncle and told the detective that J.M.R.'s parents were in New York. Detective Buckwalter asked the uncle to have the parents call him. J.M.R.'s stepmother, Maria Peralta, called Detective Buckwalter. He told her that he wished to speak to J.M.R. about a crime and that he may be in trouble, although he did not explain the specific allegations. Detective Buckwalter asked her to have a biological family member bring J.M.R. to police headquarters. Their conversation lasted approximately 5 minutes and Detective Buckwalter was able to ascertain that J.M.R.'s stepmother was not a native English speaker.

J.M.R.'s stepmother called Detective Buckwalter back and told him that J.M.R.'s uncle would bring him to headquarters to speak with the detective. A short time later, J.M.R.'s uncle, Miguel Tineo, and Mr. Tineo's employee/friend, Elvido Delacruz, responded to headquarters with J.M.R. Upon their arrival, the Juvenile was placed in an interview room and the two adults remained in a hallway near the interview room. Detective Buckwalter telephoned J.M.R.'s stepmother and obtained

3

consent to speak with J.M.R. with his uncle present. Detective Buckwalter determined that the uncle's command of the English language was poor, but that Mr. Delacruz's English was better. Detective Buckwalter explained to Mr. Tineo and Mr. Delacruz that he wanted to ask J.M.R. a few questions, that J.M.R. was doing something bad and that the behavior had to stop, and that J.M.R. would go home that day. The detective showed the men a picture obtained from the camera surveillance, which showed the actor in question. Mr. Tineo and Mr. Delacruz conceded that the J. M. R. was the juvenile in the picture. Detective Buckwalter also recalled explaining J.M.R.'s *Miranda* rights to the adults. Because there was no Spanish-speaking detective available at the time and because Mr. Delacruz appeared to understand Detective Buckwalter, he permitted both Mr. Tineo and Mr. Delacruz to be present during the interview with J.M.R.

The interview with J.M.R. was audio and videotaped. At the beginning of the interview, Detective Buckwalter explained that it was his desire to get the incidents in Allentown to stop. He further explained that he would be leaving the room so that J.M.R., his uncle, and Mr. Delacruz could discuss his *Miranda* rights. J.M.R. requested that he be permitted to speak with Detective Buckwalter outside the presence of his uncle and Mr. Delacruz. Detective Buckwalter told J.M.R. that was possible, but to discuss that with his uncle to be sure that all were in agreement. Detective Buckwalter left the room, giving Mr. Tineo the Allentown Police Department *Miranda* Rights form, which is in both English and Spanish, before he left so that the three could discuss the *Miranda* rights and J.M.R.'s willingness to give up those rights. Detective Buckwalter stopped the audio and video recorder at that point, but not before the camera recorded Mr. Tineo reading the *Miranda* form aloud, in Spanish, to J.M.R.

4

When Detective Buckwalter returned to the room, J.M.R. was signing the *Miranda* form and passing it to his uncle to sign. Again, J.M.R. requested that he be able to speak to Detective Buckwalter alone. With Mr. Tineo's consent, Mr. Tineo and Mr. Delacruz left the room. Detective Buckwalter first obtained some biographical information from J.M.R. The Juvenile began by speaking about an incident involving him throwing a rock at a police car and then began to tell Detective Buckwalter that he began to "grab people's butt." J.M.R. stated that he would see a girl walk into an alley and would go grab the girl's "butt." J.M.R. indicated that he first began to engage in this type of behavior a short time prior and that he had done this to about 10 girls. He indicated that the last one was an adult woman. He explained that he would grab his victims from behind, placing their arms behind their backs so that they would not hit him and would touch them "in their butt." J.M.R. also indicated that he would touch his victims in the vagina and around their breasts. J.M.R. indicated that he would sometimes whisper in their ear, at one time telling a victim not to move because he had a gun and used a toy gun on his victims three times. J.M.R. indicated that he attempted to get a hand down one of the victim's pants, but was unsuccessful.

The interview with J.M.R. was conducted in English and J.M.R.'s responses to Detective Buckwalter's questions were appropriate, with the Juvenile offering more information than the police knew at the time. The tone of the interview was conversational and there was no force or threats made by the police during the interview. The entire interview process took approximately 35 minutes and the Juvenile was released to his uncle after it concluded.

DISCUSSION AND CONCLUSIONS OF LAW

In his Letter Brief and Motion to Suppress, the Juvenile argues that his constitutional rights pursuant to the Fifth and Fourteenth Amendments to the United

5

States Constitution, and Article I, section 9 of the Pennsylvania Constitution were violated when he spoke to Detective Buckwalter. Specifically he argues that his waiver of his *Miranda* rights was not knowingly, intelligently and voluntarily made.

First, we note that when a challenge is made to the waiver of *Miranda* rights by a juvenile, "[r]egardless of whether a waiver of *Miranda* is voluntary, the Commonwealth must prove by a preponderance of the evidence that the waiver is also knowing and intelligent." *In re V.C.*, 66 A.3d 341, 351 (Pa.Super. 2013).

> *Miranda* holds that "[t]he [juvenile] may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived.
> *In re T.B.*, 11 A.3d 500, 505-506
> (Pa. Super. 2010)(citing *Commonwealth v. Cephas*, 361 Pa.
> Super. 160, 522 A.2d 63, 65 (1987)).

The totality of the circumstances is evaluated based on factors, including "a consideration of the juvenile's age, experience, comprehension, and the presence or absence of an interested adult[1]....the duration and means of an interrogation[,] the [juvenile's] physical and psychological state[,] the conditions attendant to the detention[,] the attitude of the interrogator[,] and "any and all other factors that could drain a person's ability to withstand suggestion and coercion." *In re V.C.* at 351 (citing *Commonwealth v. Knox*, 50 A.3d 732, 746-747 (Pa.Super.2012)).

---

[1] Although a factor in evaluating the totality of the circumstances giving rise to the waiver of *Miranda* rights, there is no longer a *per se* requirement that an interested adult be present during the interview with law enforcement. See *Knox* at 746-47.

6

In the instant case, the Juvenile, in his Case Law Summary attached to his Letter Brief, concedes that the issue of coercion, intimidation and/or deception on the part of law enforcement is not in issue in this matter. However, the Juvenile does argue that his waiver of his *Miranda* rights was involuntary, unknowing, and/or unintelligent in that it was made without a full awareness of the rights being abandoned and/or the consequences of giving up those rights. After examining the totality of the circumstances, the Court disagrees.

Several of the factors evaluated by the Court are without dispute. The Juvenile was 13 years old at the time of the interview with Detective Buckwalter and had no prior contact with the police. During his interview, both on the audio/videotape and as presented by Detective Buckwalter's testimony during the suppression hearing, the Juvenile appeared to understand and comprehend the questions posed to him and answered appropriately in response to the questions. Testimony was presented by the Commonwealth and the Juvenile that Detective Buckwalter contacted the Juvenile's stepmother, who in turn contacted the Juvenile's uncle and a family friend, to act as interested adults. After the Juvenile was brought to police headquarters, Detective Buckwalter confirmed with the Juvenile's stepmother that he was able to speak to the Juvenile with the uncle and family friend present. The tone of the interview was conversational and the Juvenile and Detective Buckwalter appeared to have a good rapport, demonstrated by the Juvenile's request to speak with the detective outside the presence of his uncle and family friend and the fact that he made revelations at that point unknown to the police.

In consideration of the factors above, the Juvenile suggests that neither Mr. Tineo (Juvenile's uncle) nor Mr. Delacruz can be deemed to be "interested and informed adults" given their limited understanding of English, lack of experience with

7

the legal system, their belief that it was the "parents" duty to sign the *Miranda* form, and because they did not know the specific crimes for which the Juvenile was been questioned. Testimony presented at the suppression hearing established that prior to the commencement of the interview, Detective Buckwalter, Mr. Tineo, and Mr. Delacruz met outside of the interview room to discuss the nature of the events leading up to the request for the Juvenile to be brought into headquarters. At that time, Detective Buckwalter believed that he told them about the nature of the incidents and that he showed them a photograph taken from the city video surveillance system depicting the Juvenile. By slight contrast, Mr. Tineo and Mr. Delacruz did not recall being told the specifics of the crimes about which Detective Buckwalter wished to speak to the Juvenile, but only that the detective stated that the Juvenile was "doing something bad" and that he "needed to stop." Mr. Tineo and Mr. Delacruz were assured that the Juvenile would be going home with them that evening.

Upon entry to the interview room, Detective Buckwalter spoke with the Juvenile, in the presence of Mr. Tineo and Mr. Delacruz, and stated that he wanted to speak to the Juvenile about things that were going on and that it was his goal to get the Juvenile's behavior to stop. Detective Buckwalter explained that giving the Juvenile a *Miranda* form was something that every child interviewed gets to read and to consider. He further explained that it contained his rights. Mr. Tineo, in Spanish and translated for Detective Buckwalter by Mr. Delacruz, told the Juvenile that he was to tell the truth to the detective. At that point in the conversation, the Juvenile requested that Mr. Tineo and Mr. Delacruz not be present in the interview. Detective Buckwalter explained that it was possible, but that he wished for the Juvenile and his family to discuss it. He again explained that the Juvenile, Mr. Tineo and Mr. Delacruz needed to read and discuss the *Miranda* form and showed each where to sign the

8

form. Despite their testimony that they did not read the form, the Court was able to review the audio/videotape interview with the Juvenile. Although the entire private exchange between the Juvenile, Mr. Tineo and Mr. Delacruz was not recorded, the Court was able to view Mr. Tineo holding the *Miranda* form and beginning to read it aloud, in Spanish. The videotape then shut off to allow Mr. Tineo and Mr. Delacruz to speak to the Juvenile privately. A few minutes later, the videotape resumed and the Court was able to observe Detective Buckwalter reenter the interview room and Mr. Tineo sign the *Miranda* form, Detective Buckwalter again asked the Juvenile if he wished to speak alone with him. He then informed Mr. Tineo that he spoke to the Juvenile's stepmother and that she authorized Mr. Tineo to act as a "parent." After Mr. Tineo agreed to allow the Juvenile to speak to Detective Buckwalter alone, the detective explained that if the Juvenile wished to stop talking to the detective, he could go out and speak with his uncle at any time.

Although it is only a factor for the Court to consider in evaluating the totality of the circumstances, the Court does believe that Mr. Tineo and Mr. Delacruz were interested and informed adults. It is clear that, although he may not recall it, that Mr. Tineo read the form containing the *Miranda* warnings and signed it voluntarily.

CONCLUSION

Given the totality of the circumstances and the consideration of the relevant factors, the Court believes that the Juvenile's waiver of his *Miranda* rights was knowing and intelligent, as well as voluntarily. Therefore, we will not suppress the statements given to Detective Buckwalter.

By the Court:

Kelly L. Banach, J.