J-A28013-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.J.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.J.K., MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1055 EDA 2024 |

Appeal from the Dispositional Order Entered March 8, 2024
In the Court of Common Pleas of Chester County
Criminal Division at No(s): CP-15-JV-0000189-2023

BEFORE: PANELLA, P.J.E., STABILE, J., and NICHOLS, J.

MEMORANDUM BY PANELLA, P.J.E.: **FILED JANUARY 28, 2025**

A.J.K., ("A.K."),[1] a minor, appeals from the March 8, 2024 adjudicatory/dispositional hearing order entered in the Chester County Court of Common Pleas, which adjudicated him as delinquent on the charges of institutional vandalism, ethnic intimidation, and criminal mischief as both a misdemeanor and a summary offense. A.K. challenges the sufficiency of the evidence supporting each charge. Further, A.K. raises a challenge to the court's admission of certain evidence. After careful review, we affirm.

The juvenile court relied on the following findings of fact, all supported in the record, in reaching its decision:

---

[1] Although the minor's name is abbreviated to "A.J.K." in the caption, the juvenile court opinion, as well as the briefs, refer to the minor as "A.K.". For consistency with the arguments presented to us, we will continue to refer to the Appellant as "A.K."

1. On Sunday morning, March 26, 2023, the [Tredyffrin] Township Police Department was contacted regarding a swastika which had been spray-painted on Valley Forge Middle School property. The Middle School is part of the Tredyffrin/Easttown School District located within Chester County.

2. At approximately 10:00 a.m. on March 26th, a Tredyffrin Township police officer arrived at the Middle School and observed that black spray paint had been used to paint a swastika, measuring approximately two (2) feet by three (3) feet, on a "dogs prohibited" sign attached to a fence located near the athletic track area. Knowing that the swastika was an offensive symbol, the reporting police officer removed the damaged sign. Before finishing removal of this first sign, the officer was notified of another nearby similarly spray-painted sign with a swastika located on a walkway that leads to the athletic field pavilion. The officer removed that second vandalized sign as well.

3. Later in the morning of March 26th, a Tredyffrin/Easttown school official notified the police department of significantly more graffiti found on and in the Middle School's athletic pavilion, located in the vicinity of the removed, damaged signs. Found on the exterior of the pavilion, was a large swastika painted in black spray paint, approximately four (4) feet by four (4) feet in size, and visible from hundreds of yards away. Within the pavilion itself, both the men's and women's bathrooms had been spraypainted with black paint indicating other swastikas and racial slurs against African Americans, including variations of the "n-word" in the interior bathroom walls. Black spray paint in large letters scrawled on the inside of one bathroom stall also made a disparaging remark about one of the school district's female students. The first and last name of that student were both painted on the stall partition wall.

4. Due to the racist and antisemitic nature of the extensive graffiti, the Tredyffrin/Easttown school officials promptly began an investigation with the police to determine who spraypainted the graffiti. The school officials also developed a plan to quickly remove the graffiti and mitigate any further harm which might be caused to students or community members from the expressed hateful language. Cleaning the damage ultimately cost the School District approximately $9,000.00.

5. Because the School District director of safety and student services believed that he would have been contacted by the Middle

School principal or custodian on Saturday, March 25, 2023 if the graffiti had been spray-painted on Friday night, March 24th, the school officials reviewed the Saturday evening, March 25th video footage taken on the Middle School property.

6. The subject juvenile, A.K., was a Tredyffrin/Easttown School District student at the time of the graffiti incident, and was a neighbor of the female student whose name was spraypainted. In addition to being a fellow School District student with, and a neighbor of, A.K., the named female and A.K. had maintained an acrimonious relationship for a number of months prior to the graffiti incident. The Tredyffrin Township police had visited both of their homes and been contacted regarding allegations, complaints or suspicions related to one or the other. Tredyffrin Township police had last visited A.K. at his home about one week prior to the graffiti incident, in part regarding communications the female had made which related to A.K.

7. On Monday morning, March 27, 2023, at approximately 8:45 a.m., the loss prevention manager for the T.J. Maxx store located near A.K.'s house, and not far from the Valley Forge Middle School, observed a black swastika spray-painted in the men's bathroom of the store. The swastika sprayed on the store bathroom wall measured approximately two (2) feet by two (2) feet in size.

8. The subject T.J. Maxx store is among the stores comprising the Gateway Shopping Center. A.K.'s house is "just behind" the Gateway Shopping Center, located less than one mile away. The Valley Forge Middle School is approximately a fifteen (15) minute walk from the T.J. Maxx store.

9. The Tredyffrin Township police were contacted about the T.J. Maxx graffiti on Monday, March 27th and quickly began an investigation, which included reviewing the Saturday, March 25th T.J. Maxx store video footage from two (2) cameras.

10. The March 25, 2023 T.J. Maxx video footage showed A.K. arriving to the store by bicycle at approximately 5:30 p.m. A.K. was recorded entering the store wearing a dark sweatshirt, dark pants and dark shoes, and walking toward the store bathrooms. After only a few minutes in the store, A.K. is shown walking out of the store without making a purchase. As he exits the store, A.K. is shown no longer wearing the dark sweatshirt but wearing

instead a black t-shirt with white "adidas" lettering. He also has on a black backpack with white lines, the same dark pants and dark shoes. The store video footage depicting A.K. also shows a can of spray paint with a black lid, denoting black spray paint, in A.K.'s right pants pocket.

11. When questioned by police on Tuesday evening, March 28, 2023, A.K. conceded that he had been to the Gateway Shopping Center on the evening of March 25th, but denied entering the T.J. Maxx store. His mother confirmed that he had ridden his bike that day to the shopping center in the afternoon or early evening. Because the T.J. Maxx store video footage clearly shows A.K. being in the store that evening, A.K.'s denial was untruthful.

12. A review of the motion-activated video footages depicting the Valley Forge Middle School property on Saturday, March 25, 2023, at approximately 9:00 p.m., shows two males walking together through the Middle School parking lot and headed in the direction of the swastika painted signs and the Middle School pavilion. One of the males is wearing all dark clothing, consisting of a dark sweatshirt, dark grey sweatpants and black sneakers with white markings. He is also wearing a black backpack with white reflective lines which exactly matches the backpack A.K. is shown wearing a few hours before at the Gateway Shopping Center T.J. Maxx store. The clothes and sneakers of this male are also consistent with those worn by A.K at the T.J. Maxx store.

13. The second male recorded on the Middle School video footage is wearing white shoes, light colored pants and a dark sweatshirt. Both individuals have their sweatshirt hoods raised over their heads, and both are wearing "shiesty" masks covering their faces.

14. The two males crossing the Middle School parking lot are first recorded walking toward the signs which were found the next day, spray-painted with swastikas. The signs are shown on the school video as unmarred, and then appear painted with swastikas immediately after the two males passed them. Following the swastikas being painted on the signs, the two males are recorded walking toward the Middle School athletic pavilion.

15. On Monday, March 27th, A.K. reported to the [Tredyffrin]/Easttown School District administrative offices, at the request of school officials, to answer questions regarding the graffiti discovered the day before at the Middle School. When A.K.

arrived at the school, a photograph was taken of the sneakers he was wearing. The photograph depicts A.K. wearing black sneakers with white markings which match the sneakers of the male shown on the Middle School video wearing the all-dark clothes. When the Tredyffrin Township police officers questioned A.K. and his mother at A.K.'s home on Tuesday evening March 28th, the same black sneakers with white markings, a Brooks sneaker model, were on the floor by the front door in A.K.'s home and identified by A.K.'s mother as A.K.'s sneakers.

16. When Tredyffrin Township police officers visited with A.K. and A.K.'s mother on the evening of March 28, 2023, A.K.'s mother informed the police that A.K. and A.K.'s cousin had been out together the evening of Saturday, March 25th. The description she gave of the clothing A.K. and his cousin had worn that evening matched the clothing worn by the two males depicted on the Valley Forge Middle School property walking toward the graffiti damaged signs and athletic pavilion. She specifically informed the police that A.K. was wearing grey sweatpants and a dark sweatshirt, while his cousin was wearing light sweatpants and a dark sweatshirt. A.K.'s mother also told the police that A.K. had been at the Gateway Shopping Center earlier on Saturday, March 25th, came home and then went out again that evening with his cousin.

17. A review of A.K.'s school computer activity by the Tredyffrin/Easttown School District director of educational programs, who oversees the school technology department, revealed that prior to the March 25th graffiti incident, A.K. had been conducting computer searches on the school district's network for the "shiesty" mask worn by the two males depicted on the Middle School property the evening of March 25th. The analysis of A.K.'s computer searches also showed racially charged searches, including searches using the "n-word," conducted on March 21, 2023, just days before the subject crimes.

18. The director of educational programs confirmed that these searches were conducted on A.K.'s school-provided computer, and that the computer name assigned to A.K.'s computer was a unique name tied only to A.K.

Juvenile Court Opinion, 5/22/24, at 3-8 (citations and footnotes omitted).

On October 2, 2023, following an adjudicatory hearing held pursuant to Pa.R.J.C.P. 406, the juvenile court found A.K. guilty of institutional vandalism, ethnic intimidation, criminal mischief, graded as a third-degree misdemeanor, and criminal mischief, graded as a summary offense.

On March 8, 2024, following an adjudication of delinquency hearing held pursuant to Pa.R.J.C.P. 409, the court adjudicated A.K. delinquent on the above-referenced charges and placed A.K. on probation. The court noted its decision and sentence in a written adjudicatory/dispositional order entered on the same day. This timely appeal followed.

In his first three issues, A.K. contends the evidence was insufficient to prove beyond a reasonable doubt that he committed the delinquent acts alleged against him. A.K. does not contest that the offenses occurred, just that he was found to be the perpetrator.

"An adjudication of delinquency requires the juvenile court to find that the juvenile: (1) has committed a delinquent act and (2) is in need of treatment, supervision, or rehabilitation." ***Interest of C.B.***, 241 A.3d 677, 681 (Pa. Super. 2020) (emphasis and citation omitted); ***see also*** 42 Pa.C.S.A. § 6341(b) (explaining that the juvenile's commission of a delinquent act must be established beyond a reasonable doubt, and the court may find the juvenile

is in need of treatment, supervision, or rehabilitation by a preponderance of the evidence).[2]

Our review of a sufficiency challenge to an adjudication of delinquency is well-settled:

> When a juvenile is charged with an act that would constitute a crime if committed by an adult, the Commonwealth must establish the elements of the crime by proof beyond a reasonable doubt. When considering a challenge to the sufficiency of the evidence following an adjudication of delinquency, we must review the entire record and view the evidence in the light most favorable to the Commonwealth.
>
> In determining whether the Commonwealth presented sufficient evidence to meet its burden of proof, the test to be applied is whether, viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences therefrom, there is sufficient evidence to find every element of the crime charged. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by wholly circumstantial evidence.
>
> The facts and circumstances established by the Commonwealth need not be absolutely incompatible with a defendant's innocence. Questions of doubt are for the hearing judge, unless the evidence is so weak that, as a matter of law, no probability of fact can be drawn from the combined circumstances established by the Commonwealth.

*In re V.C.*, 66 A.3d 341, 348–49 (Pa. Super. 2013) (citation omitted).

---

[2] Although A.K. does not challenge the second required finding, we note the juvenile court explicitly found him to be in need of rehabilitation, supervision, and treatment. *See* Adjudicatory/Dispositional Hearing Order, 3/8/24, at 1.

A determination of evidentiary sufficiency is a question of law, and therefore, our standard of review is *de novo* and our scope of review is plenary. **See Commonwealth v. Woodard**, 129 A.3d 480, 489 (Pa. 2015).

Notably, while A.K. purports to challenge only his identification as the perpetrator of the crimes charged, he fails to develop any real argument in this regard on appeal. Instead, A.K. confusingly spends a majority of his argument raising claims that were not raised with the juvenile court or in his 1925(b) statement, **see** Appellant's Brief, at 9-13 (discussion about the admissibility and authentication of electronic communications); **see id.** at 15-16 (raising for the first time a constitutional challenge to the ethnic intimidation statute) or challenging the sufficiency of elements that were not included in his 1925(b) statement, **see id.** at 16 (briefly claiming the Commonwealth failed to prove the element of "malicious intention motivated by hatred towards the race, color, or national original of the victim.")

A.K. provides very little citation to and discussion of relevant authorities, or any relevant analysis regarding the actual issues raised. **See** Pa.R.A.P. 2119(a) (providing an appellate argument shall include "such discussion and citation of authorities as are deemed pertinent."). A.K.'s sufficiency challenges could be waived for these reasons alone. **See** Pa.R.A.P. 302(a) ("issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); **see also Commonwealth v. Lopata**, 754 A.2d 685, 689 (Pa. Super. 2000) ("A claim which has not been raised before the trial court cannot

be raised for the first time on appeal."); *see Lackner v. Glosser*, 892 A.2d 21, 29 (Pa. Super. 2006) ("[A]rguments which are not appropriately developed are waived.") (citation omitted). However, we nevertheless closely reviewed the certified record and conclude that his claims are without merit.

Here, A.K.'s sufficiency claims relate solely to the sufficiency of the Commonwealth's identification evidence. Accordingly, we limit our analysis to the evidence for that element. *See Commonwealth v. Cain*, 906 A.2d 1242, 1244 (Pa. Super. 2006) (declining to address the sufficiency of the evidence supporting every element of an offense where the appellant raises a claim relating to one specific element); *see also Commonwealth v. Smyser*, 195 A.3d 912, 915 (Pa. Super. 2018) ("In addition to proving the statutory elements of the crimes charged beyond a reasonable doubt, the Commonwealth must also establish the identity of the defendant as the perpetrator of the crimes") (citation omitted).

In its opinion, the juvenile court thoroughly addressed A.K.'s sufficiency claims and concluded they lack merit. *See* Juvenile Court Opinion, 5/22/24, at 9. The juvenile court expressly credited the following evidence:

> In accordance with the credible facts, within approximately a day and a half prior to the discovery of the black painted swastika in the T.J. Maxx store bathroom, A.K. was recorded on the store video camera walking toward the bathroom and then leaving the store after a few minutes, possessing a can of black spray paint in his pocket. A.K. had purchased nothing in the store. When asked by the police a few days later if he was in the T.J. Maxx store on the date he was shown to have been there, A.K. lied, denying his presence there. A long recognized evidentiary principle holds that the making of a false statement by the accused

to the police may be inferred by the fact finder to demonstrate an intent to avert suspicion and an indication of guilt. *See Commonwealth v. Boyle*, 447 A.2d 250,255-256[] (Pa. 1982). A.K. appeared to have no purpose for entering the store other than using his spray paint. His intent to avert suspicion significantly enhanced that conclusion.

This extremely strong evidence that A.K. spray-painted the swastika in T.J. Maxx's bathroom is exponentially augmented, and strengthened, when it includes the Valley Forge Middle School video evidence. That camera evidence depicts a male wearing all dark clothing, sneakers, and a backpack, consistent with the clothes, shoes and backpack A.K. was wearing at the T.J. Maxx store a few hours earlier, walking up to the two Valley Forge Middle School signs which are undamaged, but then shown spray-painted with black swastikas immediately after he and his male companion leave them. It is a reasonable inference that A.K. painted those swastikas, as well as the T.J. Maxx swastika, with his can of black spray paint, before walking, in accordance with his video-depicted direction of travel, to the Middle School athletic pavilion, and once there, also spray painting the black swastika found on the pavilion exterior. Each of these four symbols of racial hatred are identical, each are painted with the exact type of paint, spray paint, and with the same color paint, black, A.K. had on his person that evening. It is an additional reasonable deduction that A.K. used his black spray paint to then deface the interior of the pavilion with racial slurs and a derogatory remark against his female neighbor and fellow student. Importantly, A.K.'s last police contact related to his ongoing acrimonious relationship with her, was just days before this targeted verbal attack. Therefore, at the time of the spray painting, A.K. had a unique and timely reason to disparage her.

Consistent with, and supportive of, these inferences, the evidence proved A.K. was out with his cousin the evening of March 25,2023, after coming home from the T.J. Maxx store. Both A.K. and his cousin were wearing clothes which exactly matched the clothes worn by the two males depicted walking on the Middle School property. Indeed, the black Brooks sneakers with white markings A.K. is seen wearing in school a few days after the crimes, and which were shortly thereafter found at his home, exactly matched the shoes worn by the male wearing all dark clothes at the Middle School. Valley Forge Middle School was within an easy walking distance of A.K.'s house, and prior to the

Valley Forge Middle School offenses, A.K. had used his computer for information regarding the particular "shiesty" mask that both males were wearing that evening. Just as significantly, A.K.'s computer searches also included racially charged language against African Americans, including the identical racial slur spray-painted in the Middle School pavilion. It is reasonable to infer that soon after A.K. typed this racial slur into his computer, he spray-painted that same racial slur, and other related racial disparagements inside the pavilion

*Id.* at 10-12.

The juvenile court, as the finder of fact in this delinquency proceeding, was free to make credibility determinations and "to believe all, part, or none of the evidence." *Interest of D.J.B.*, 230 A.3d 379, 387 (Pa. Super. 2020) (citation omitted). The evidence, viewed in the light most favorable to the Commonwealth as the verdict-winner, was sufficient to establish A.K.'s identity as the perpetrator of the crimes charged. Therefore, his sufficiency claims lack merit.

In his final issue, A.K. contends the trial court committed an error of law when it allowed witness testimony regarding an alleged relationship held by A.K. where the witnesses had no personal knowledge of the relationship, and the testimony was speculative in nature. This issue was not properly preserved and is therefore waived.

Pennsylvania Rule of Evidence 103 addresses rulings on evidence and provides, in pertinent part, as follows:

**Rule 103. Rulings on Evidence**

**(a) Preserving a Claim of Error.** A party may claim error in a ruling to admit or exclude evidence only:

- 11 -

(1) if the ruling admits evidence, a party, on the record:

> (A) makes a timely objection, motion to strike, or motion *in limine*; and

> (B) states the specific ground, unless it was apparent from the context; …

Pa.R.E. 103(a)(1).

Pursuant to Pa.R.A.P. 302 and Pa.R.E. 103, our courts have long held that to preserve a challenge to an evidentiary ruling, a party "must make a timely and specific objection" to the admission or exclusion of the evidence. ***Commonwealth v. Pacheco***, 227 A.3d 358, 373 (Pa. Super. 2020) (citation omitted). A party's failure to make a specific objection deprives the trial court and the opposing party of the opportunity to either respond to the objection or to alter the course of the questioning accordingly. ***See Commonwealth v. Willis***, 552 A.2d 682, 690 (Pa. Super. 1988). Accordingly, the failure of a party to make a timely and specific objection to an evidentiary violation results in a waiver of that ground on appeal.

On appeal, A.K. takes issue with testimony by Chris Groppe and Corporal Christopher Middleton, who both testified for the Commonwealth. Groppe, the director of safety and student services for the school district, testified regarding the graffiti found around the school. When asked if the female student named in a disparaging remark by the graffiti had any relation to A.K., defense counsel made a general objection. ***See*** N.T., Adjudication Hearing, 10/2/23, at 31-32. When the court requested the basis of his objection,

- 12 -

defense counsel simply responded with the question, "How would he know about a relationship between …." *Id.* at 32. Because there was no specific basis for the objection raised, the court overruled the objection, while clarifying that defense counsel could question Groppe about his knowledge of the relationship on cross-examination. Groppe then responded to the initial question, stating only that he learned A.K. and the female were neighbors and had "some sort of relationship." *Id.* On cross-examination, defense counsel did not ask Groppe any questions related to the relationship, or regarding the female, at all.

Corporal Middelton subsequently testified regarding his response to the incident. When asked if the disparaging remark about the female student had any significance to him, as it pertains to the case, Corporal Middleton responded he was aware of a prior relationship between A.K. and the female, who was A.K.'s neighbor, and that they had discontinued their relationship. *Id.* at 88-89. Corporal Middleton also testified that he personally responded to the female's household regarding another incident involving A.K. and the female. *See id.* at 88. No objection at all was made to Corporal Middleton's direct testimony regarding the relationship.

On the contrary, on cross-examination, defense counsel himself confirmed that the female was A.K.'s neighbor, while attempting to elicit further information from Corporal Middleton about his prior knowledge of incidents between the female and A.K. *See id.* at 102. Corporal Middleton

responded that the female was a "direct neighbor," and that he had been to both her house, and A.K.'s house, regarding incidents alleged to have involved one or the other. *Id.* at 102-103. During this line of questioning, defense counsel himself brought up separate incidents that occurred between A.K. and the female, at least one of which Corporal Middelton did not bring up himself and claimed to have no personal knowledge. *See id.* at 103.

Accordingly, as noted by the trial court, A.K. did not make a specific objection to Groppe's testimony and did not object at all to Corporal Middleton's testimony. *See* Trial Court Opinion, 5/22/24, at 13-14. We agree with the trial court's conclusion that the issue was not properly preserved in the trial court. Therefore, this issue is waived. *See Pacheco*, 227 A.3d at 373; *see also Lopata*, 754 A.3d at 689; Pa.R.A.P. 302(a). In any event, the testimony established where the witnesses gained knowledge of this relationship and the testimony was clearly not speculative.

As we find all of A.K.'s issues are either waived, and/or without merit, we affirm the dispositional order of the juvenile court.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/28/2025

- 14 -