J-A05033-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF R.A.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: R.A.P. | : | |
| | : | |
| | : | No. 930 WDA 2019 |

Appeal from the Dispositional Order Entered March 18, 2019
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s):  CP-65-JV-0000309-2018

BEFORE:  BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED APRIL 20, 2020**

R.A.P., a minor at the time of his offenses, appeals from the dispositional order entered by the Westmoreland County Court of Common Pleas (juvenile court) following his adjudication as delinquent on the charges of rape, involuntary deviate sexual intercourse, aggravated indecent assault, two counts of sexual assault and three counts of indecent assault.[1]  We affirm.

**I.**

This appeal arises from an incident that occurred on April 21, 2018, when R.A.P. was 17 years old and E.B., the victim, was 16 years old.  They both

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 3121(a)(1), 3123(a)(1), 3125(a)(1), 3124.1, and 3126, respectively.

attended the same high school, and during the summer of 2017, they began communicating on the messaging platform "Snapchat."[2] E.B. claimed that R.A.P. then forced her to have vaginal sex and to perform oral sex on him against her will. R.A.P. claimed that E.B. initiated the consensual sexual encounter, but that he told her after it was over that he wanted only to be friends and did not want an ongoing romantic relationship. E.B. then falsely accused him of rape.

Because of the arguments raised by R.A.P., unfortunately, a detailed description of the evidence adduced at the dependency hearing by the Commonwealth and R.A.P is necessary.

**A.**

Mainly through the testimony of E.B and her friends, M.I. and S.G, the Commonwealth presented the following version of events as confirmed by our reading of the record.

That testimony revealed that E.B. and R.A.P, although they had frequent Snapchat communications, met one time before the incident at issue when, after arranging a date on Snapchat sometime in August of 2017, R.A.P. picked E.B. up at her home, met her parents and went on a date to a restaurant. After the date, E.B. stated that they "made out," only involving kissing in her parents' driveway but that she rejected his request to have sex. After that date, she did

---

[2] Snapchat messages that are not saved are available for only ten seconds before they disappear.

not have any more contact with R.A.P. because he blocked her from his Snapchat account.

In April 2018, R.A.P unblocked E.B. and they began communicating with each other solely through Snapchat. Those snaps would occur daily with frequent back and forth messaging and they discussed meeting again in person.

On the evening of April 21, 2018, E.B. went to a friend's house and, after eating dinner, began to feel ill. She told R.A.P. over Snapchat that she was not feeling well and he offered to pick her up and drive her home. On the ride from her friend's house, E.B. texted her mother. (Reproduced Record (R.R.) 82.)[3] The text from E.B. to her mother sent at 9:01 p.m. said, "[R.A.P.] is bringing me home in a little. He wants to come in. What do I say?" (R.R. 53, 216.) However, her mother responded by messaging at 9:14 p.m: "You say no, my parents are not home." *Id.*

Not getting a reply from her mother, E.B. remained in the car "french kissing." When the kissing stopped, R.A.P asked to walk her to the door and she said no thank you, but he walked her to the door anyway. (R.R.) 81-82.) When he asked to come in again, E.B. said that no one is home but he persuaded her to let him the house so he could play an Xbox video game called Fortnite. (R.R. 84.) They went into the living room and as E.B. went to turn on the television

_____

[3] Because no one could recall the exact times of the events, E.B.'s mother's cell phone retained these texts from that night. (R.R. at 216, 451.) These texts were printed out and were placed into evidence to reveal these exact times.

and the Xbox game, R.A.P. came up from behind her and began hugging her but she continued to turn on the video game. (R.R. 87.) R.A.P then took E.B. over to the couch, pulled E.B. on top of him and they started to kiss.

R.A.P. then started to take off E.B.'s bra but she told him that she didn't want to do that and put her arms over her breasts in an X position to cover them and told him no; but he did not stop, instead flipping her over onto her back and pulled her leggings down with her underwear. She put her hands in an X position again covering her breasts and put her kneecaps together in an attempt "to get him to not touch [her] down there because [she] did not want that." (R.R. 90-91.) She testified that he ignored her and put his fingers in her vagina as she was repeatedly telling him no. As E.B. was telling him to stop, he pulled his fingers out of her vagina and forcefully put them into her mouth causing her to gag. After she gagged, R.A.P pulled his fingers from her mouth and got off her. She told him "that isn't cool" and he apologized by saying that he was sorry and did not mean it. (R.R. 92) R.A.P. then left the room, telling her that he was going upstairs to her bedroom. (*Id.*)

E.B. then pulled her leggings back up, strapped her bra back on, and then put on the big jacket she had on earlier in the night because she "didn't want to be violated again." (R.R. 94, 95.) She went upstairs to get R.A.P. out of her house but when she went into her room, his shirt was off and he pushed her over the bedpost onto her back. Her upper body was on the bed at an angle, but from her kneecaps down, she was almost off the bed; her feet were off the bed and her hands were trapped behind her back almost at her waist.

R.A.P then pulled her leggings and underwear off again and pulled his pants down, got on top of her with his penis penetrating her vagina. As this was occurring, she testified that she was saying stop and no, trying to push her kneecaps and thighs together to get him to stop. As he penetrated her, E.B.'s body was moving closer to the edge of the bed. When he pulled out, she flopped onto her stomach onto the floor of the bedroom with the right side of her face down on the carpet, her hands behind her back palms facing up. She felt his penis penetrate her vagina from behind when she was on the floor while she heard him say "really quick, really quick." (R.R. 105.) She was squirming and trying to get up, but her hands were behind her back. She felt his hands around her waist and lower back. She testified that R.A.P. was getting mad because he was penetrating her harder and harder.

After he pulled his penis out from her vagina the second time, he was sitting on the edge of the bed and told her that she was going to make him "finish". (R.R. 108-109.) He grabbed her on the left side of her neck and shoulder as she was saying no repeatedly and he pushed her head down on his penis. As he was pushing his penis into her mouth, E.B. was attempting to get free. As E.B. tried to push her head up, R.A.P. was pushing her head down. She tried to say no but his penis never came out of her mouth until after he ejaculated. Immediately after he ejaculated, his semen came out of E.B.'s mouth onto his stomach, and he got really mad at her for not swallowing it. He told her to clean it up but she grabbed a tissue and gave it to him to clean up. He cleaned himself off and threw the tissue in the garbage can in her room.

R.A.P. then told E.B. that "[m]y job here is done" and walked downstairs and left. (R.R. 112.)

E.B. put her clothes on and heard R.A.P. leave. She immediately ran downstairs to get her phone from the couch where she put it when she came home. That is when E.B. saw her mother's message about not letting R.A.P. into the house. The time on the text message showed 9:14 pm. E.B. immediately responded at 9:14 telling her mother that R.A.P. just dropped her off because she did not want to tell her mother that she was just sexually assaulted. After responding to her mother's texts, E.B. immediately called her best friend M.I.

After receiving her phone call, M.I and her boyfriend, S.G., drove to E.B.'s house arriving within 15 minutes after E.B.'s call. Both observed that E.B. was crying so hard that she could not speak and got in the back of S.G.'s car while M.I. got out and sat in the back seat with her. They then took her to a Dunkin Donuts where she told them what happened. After M.I. sent R.A.P a Snapchat telling him to stay away from E.B. or she will call the police, R.A. P. then blocked M.I. R.A.P. then sent the following Snapchat message directly to E.B., witnessed by both S.G. and M.I.:

> I'm sorry for putting you through everything I've done to u and using and playing u. I feel bad but you are a great person but like every time we do stuff it just makes me feel wrog for doing it cuz ik I'm using u. I fucked up. Okay did I thing I was going to do more with you after tonight? Yes I honestly did and I think we can be friends but I don't wanna use u basicly like I did tonihht so I'm sorry for hurting u physically and mentally but I'd rather be friends and no do anytbing and I'm sorry for everything tonihht I was just being a horny fuck and wasn't using my head, but we can't change the past but we can make the future a better place for us. I will honestly

from the bottom of my heart never lay a hand on you again and never use u or try to because ik I fucked up big time.

I can't express how bad I feel.

Why am I dumb shit [(two frowny face emoticons.)] Plse talk back so we can work things out between us no one else just me and u E.B.

(Commonwealth's Exhibits 2A, 2B, Snapchat message sent to E.B. from R.A.P., 4/21/18, at 10:27 p.m.).

When R.A.P. sent this message to E.B., M.I. used her personal cell phone to take pictures of this Snapchat message. Upon seeing this message, S.G. testified that he was so upset that he got R.A.P.'s address, stopped for gas, and drove to R.A.P.'s house to confront and fight him. S.G. was not told to go but did so on his own, with both M.I. and E.B. in the car. S.G. drove to R.A.P.'s house, knocked on his door and attempted to Snapchat R.A.P. to come out of his house and give his version. The lights were on in R.A.P.'s house and the window blind moved, but nobody came out. After ten minutes of waiting, S.G. got back in his car and drove E.B. back to her home. On the way, he and M.I. tried to persuade E.B. to tell her mom what happened.

E.B. texted her mom at approximately 11:09 p.m. saying she was on her way home from being out with M.I. and S.G. S.G. and M.I. dropped E.B. off at her house and left. No one was home when E.B. arrived so she went to bed. The morning of April 22, 2019, E.B. woke up to a text from M.I. telling her not to shower and tell her parents what happened. E.B. then went to her parents and told them what happened while her brother was out of the room. E.B.'s

parents called 911 who dispatched Officer Robert Kwaitkowski from the Manor Borough Police Department to their house. E.B. then went to the hospital with her mother where she was examined.

**B.**

R.A.P. presented the following version of events that our reading of the record supports as to what he testified and others testified in his presentation of the case. R.A.P. recounted a much different version of what occurred in apparently the only two "live" encounters between them.

R.A.P. agreed that his relationship with E.B. started after the two began to communicate back and forth *via* Snapchat and that in August 2017, they went out to dinner. After dinner, E.B. brought up their having sex and they went to his parent's basement and had oral and anal intercourse. E.B. snapchatted R.A.P. afterwards that she had a fun time, but R.A.P. told E.B. that he was not interested in having a romantic relationship with her and as a result discontinued further communication with E.B. through Snapchat.

Two other classmates stated that both R.A.P. and E.B. confirmed that they had sex. G.P. testified that R.A.P. told him he had sex with E.B. sometime in 2017. He later became friends with E.B. and asked her if what R.A.P. told him was true, and E.B. responded that it was true and that the sex they had occurred in R.A.P.'s basement in 2017. B.G., who was friends with both E.B. and R.A.P., testified that after E.B. alleged that R.A.P. raped her, E.B. admitted to having sex with R.A.P. in August 2017. B.G. also stated that E.B. asked him to obtain a package of condoms and that B.G. had, in fact, obtained the condoms for her.

On April 16, 2018, E.B. re-initiated contact with R.A.P., and from that date through April 21, 2018, E.B. and R.A.P. were in constant contact. On April 21, 2019, E.B. and R.A.P. Snapchatted each other back and forth for hours on end. R.A.P. was returning to his home from a college visit with his parents in upstate New York and E.B. snapped that she was with some friends at a friend's house and the girls were eating pizza and each using their phones. He testified that E.B. eventually messaged him that she wanted to get away from her friends and get together with him and that she messaged R.A.P. the address where he should pick her up.

After picking E.B. up from her friend's house a little after 8:00 p.m., the two went to E.B.'s home. When they arrived at E.B.'s residence, they proceeded to the first-floor family room where R.A.P. removed his shoes and proceeded to attempt to play games on the Xbox before E.B. stated that they could be doing something better. The two then began kissing and R.A.P. unhooked E.B.'s bra and fondled her breasts, all with E.B.'s consent. R.A.P. then removed E.B.'s yoga pants and touched her vagina with his fingers, again with E.B.'s consent, and E.B. then led him upstairs to her bedroom. They removed each other's clothes and R.A.P. lied back on E.B.'s bed while she performed oral sex on him.

At one point, R.A.P. testified that he put his hand on the back of E.B.'s head and pushed her down onto his penis but that E.B. resisted and R.A.P. then withdrew his hand. Eventually, R.A.P. ejaculated in E.B.'s mouth and E.B. spit R.A.P.'s semen out onto his stomach and chest. E.B. then got a tissue and R.A.P. cleaned the semen off. R.A.P. explained that after he had ejaculated, E.B. still

wanted him to perform vaginal sex and E.B. produced a condom for him to put on. While R.A.P. was able to put the condom on his penis, he was unable to achieve a sufficient erection to perform vaginal sex.

The two then got dressed. E.B. told R.A.P. to take the condom with him so her parents would not find out. They then proceeded downstairs and turned the television on and R.A.P. played on the Xbox for about a half an hour. While downstairs, R.A.P. told E.B. that he only wanted to be friends; E.B., however, took what he said as a joke.

E.B. then told R.A.P. her family was returning shortly and he departed the residence. On the way home, R.A.P. reiterated to E.B. via Snapchat that he was serious about not wanting a relationship with her and only wanting to be friends. E.B. did not respond.

Later, however, E.B. Snapchatted R.A.P. that she was going to ruin his life by claiming that he had raped her because he had used her. R.A.P. testified that he then apologized for using her for sex a second time and for in any way hurting her by placing his hand on the back of her head while she performed oral sex on him. At that point, however, E.B. had gotten her friends involved and her allegations against R.A.P. persisted. R.A.P. then told his mother what happened. She instructed him not to respond via Snapchat any further.

### C.

Officer Kwaitkowski testified that when he arrived to obtain the basic information as to what happened, he advised E.B. to go to the hospital where a "rape kit" was done. Dr. Heather Walker, the trauma physician who conducted

the sexual examination of E.B., described that although there were no cervical wounds or abrasions in the pelvic examination, there was injury referred to as "mild tenderness to the left upper lateral chest and anterior left shoulder and lateral neck area" in the physical examination. Dr. Walker also testified that she found no physical evidence of scratches or redness to E.B.'s body nor any evidence of rug burns to E.B.'s face or any other part of her body.

After the rape kit was collected, Officer Kwaitkowski asked for assistance in this investigation by the Westmoreland County Detective Bureau. Detective John Mandarino assisted Officer Kwaitkowski in obtaining the physical evidence and statements from R.A.P.

On May 3, 2018, R.A.P., accompanied by his parents, arrived at the Manor Police Station, and Detective Mandarino advised him of his **Miranda** rights and signed a waiver of his rights. R.A.P. gave a verbal statement to the officers acknowledging that he knew he was there because E.B. was accusing him of rape.

In his interview, R.A.P. conceded that oral and vaginal sex occurred but stated that it was consensual. When he finished his verbal version of events, Detective Mandarino confronted R.A.P. with his Snapchat message to E.B. on the night of the assault. R.A.P. admitted that he mentally hurt E.B. because he was using her for sex and did not respect E.B. that night. He testified that vaginal sex occurred after the oral sex in which he ejaculated and he could not get a condom on afterward because he could not get an erection. He told Detective

Mandarino he tried a "few times" to have vaginal sex, but gave up playing video games instead.

Based on the testimony, the juvenile court adjudicated R.A.P. delinquent of the above-mentioned charges. The court ordered R.A.P. to serve a term of probation on home electronic monitoring until further order of court, subject to a three-month review. Following oral argument, the juvenile court denied R.A.P.'s post-disposition motion. R.A.P. timely appealed and he and the juvenile court complied with Rule 1925. **See** Pa.R.A.P. 1925(a)-(b).

## II.

R.A.P. challenges the sufficiency of the evidence supporting his delinquency adjudication, arguing that he presented compelling evidence that he engaged in consensual sexual activity with E.B.[4] (**See** R.A.P.'s Brief, at 6, 30, 34).[5] We review a challenge to the sufficiency of the evidence under the following, well-settled standard of review:

---

[4] In the crimes that he was adjudicated delinquent—rape, involuntary deviate sexual intercourse, aggravated indecent assault, sexual assault, indecent assault—requires that the sexual act be done either by "forcible compulsion" or without consent. Forcible compulsion is defined as "[c]ompulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied . . . that compels a person to engage in sexual intercourse against the person's will." 18 Pa.C.S. § 3101.

[5] "When a juvenile is charged with an act that would constitute a crime if committed by an adult, the Commonwealth must establish the elements of the crime by proof beyond a reasonable doubt. When considering a challenge to the sufficiency of the evidence following an adjudication of delinquency, we must review the entire record and view the evidence in the light most favorable to the

A challenge to the sufficiency of the evidence is a question of law, subject to plenary review. When reviewing a sufficiency of the evidence claim, the appellate court must review all of the evidence and all reasonable inferences drawn therefrom in the light most favorable to the Commonwealth, as the verdict winner. Evidence will be deemed to support the verdict when it establishes each element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. The Commonwealth need not preclude every possibility of innocence or establish the defendant's guilt to a mathematical certainty. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

**Commonwealth v. Williams**, 871 A.2d 254, 259 (Pa. Super. 2005) (citations and quotation marks omitted).[6]

R.A.P. contends that the evidence is not sufficient for the juvenile court to adjudicate him delinquent of the charged crimes because the evidence does not support such a finding as a matter of law. In making this argument, he combines two separate principles on which we should reverse the trial court's decision as a matter of law.

---

Commonwealth." **In re V.C.**, 66 A.3d 341, 348 (Pa. Super. 2013), *appeal denied*, 80 A.3d 778 (Pa. 2013) (citation omitted).

[6] We note that the uncorroborated testimony of a rape victim, if believed, is sufficient to support a rape conviction and no medical testimony is needed to corroborate a victim's testimony if the testimony is accepted as credible by the jury. **See Commonwealth v. Gabrielson**, 536 A.2d 401 (Pa. Super. 1988). This holding is required by 18 Pa.C.S. § 3106, which provides "The credibility of a complainant of an offense under this chapter shall be determined by the same standard as is the credibility of a complainant of any other crime. The testimony of a complainant need not be corroborated in prosecutions under this chapter. No instructions shall be given cautioning the jury to view the complainant's testimony in any other way than that in which all complainants' testimony is viewed."

**A.**

One of the principles that R.A.P. advances that allows us to find the evidence sufficient is the doctrine of equipoise. This doctrine is based on the premise that "[w]hen two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a jury must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty." **Commonwealth v. Woong Knee New**, 47 A.2d 450, 468 (Pa. 1946).

In contending that doctrine of equipoise applies to this case, R.A.P. relies on **In re JB**, 189 A.3d 390 (Pa. 2018), a case that deals with what inferences can be drawn from proven facts. That case involved J.B. and an 11-year-old male child who lived with his father, his father's fiancée (K.M.H.), and K.M.H.'s daughters, aged four and seven. He was adjudicated to have committed the homicide of K.M.H and K.M.H.'s unborn child. All of the evidence against J.B. was circumstantial.

It was established that on the morning of the murder, after J.B.'s father had gone to work, J.B. and K.M.H's seven-year-old daughter left the house to board their school bus at 8:15 a.m. Workers arrived at the house at 9 a.m. and discovered K.M.H.'s four-year-old crying and K.M.H. apparently dead of a shotgun wound to the neck. There was testimony that J.B. and his father were hunters, and that J.B. kept guns, including the shotgun that killed K.M.H., in his room. J.B's clothes and hands tested positive for what appeared to be recently deposited gunshot residue and there were no bloodstains. When tested, J.B.'s

- 14 -

father's hands and clothes were residue-free. A shell casing that appeared to be the shell that was used to kill K.M.H. was found in the driveway, but it lacked either fingerprints or DNA evidence. Other potential suspects included K.M.H.'s former boyfriend, who was subject to a protection from abuse order and had made death threats to K.M.H. as recently as the previous evening. J.B. also testified that when he was leaving for school, there was a black van he did not recognize parked in the driveway, a fact no other evidence corroborated.

Reversing the juvenile court and this Court, notwithstanding the deferential standard of review given to factual findings, our Supreme Court held there is an exception where "the entire body of evidence introduced at trial which furnished the basis for an appellant's conviction is so deficient that it does not reasonably support a finding of guilt beyond a reasonable doubt, as a matter of law." *Id.* at 409. In other words, there may be cases where "the trial evidence equally supported two reasonable but diametrically opposed ultimate inferences: one that the defendant committed the murder, and the second that he did not commit the murder." *Id*. "[I]n those atypical situations, our Court has consistently held that we are not bound by the factual findings and credibility determinations rendered by the finder of fact, and we are compelled in such circumstances to reverse a legally erroneous conviction." *Id.*

Our Supreme Court discussed what could be discerned from the found evidence and concluded, at most, that it supported two equal but fundamentally inconsistent inferences. *Id.* at 411. The Court explained that the coroner could not fix the exact time of death and provided only a range of times based on rigor

mortis, nor prove that the defendant was with the deceased at the time of death. *Id.* Moreover, even if the defendant was with the deceased at or near the time of death, this fact alone did not support an inference of murder; "it merely raised a conjectural suspicion which was in and of itself insufficient to convict." *Id.*

While, as R.A.P. suggests, we can reverse a juvenile adjudication delinquency where the found evidence allows two equal but inconsistent inferences does not mean just because we have two different versions of events that we can reverse. Once the factfinder accepts one version of events, that is the only found evidence from which inferences can be drawn. Once the juvenile court found E.B.'s testimony to be credible, her testimony is the only relevant testimony in determining whether there is sufficient evidence to sustain the conviction beyond a reasonable doubt. Simply, the doctrine of equipoise does not apply.

### B.

The other basis that R.A.P. contends that we can reverse is the contradictions, inconsistencies and irreconcilable conflicts inherent within the Commonwealth's case that makes it so unreliable that it does not support, as a matter of law, a finding of guilt beyond a reasonable doubt. The legal underpinning of this argument flows from our Supreme Court's decision in *Commonwealth v. Farquharson*, 354 A2d. 545 (Pa. 1976), where it noted that although credibility determinations and weighing of the evidence are for the factfinder and an appellate court will not re-weigh the evidence, there is also a principle that provides "that a verdict of guilt may not be based upon surmise or

conjecture." *Id.* at 550. It found that "where the evidence offered to support the verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding." *Id*. In such a situation, the evidence would be insufficient to support the verdict.

In *Commonwealth v. Karkaria*, 625 A.2d 1167 (Pa. 1993), our Supreme Court applied this principle and concluded that the testimony of the complainant was so contradictory and unreliable that it was incapable of supporting a guilty verdict and, thus, the evidence entered by the Commonwealth was insufficient as a matter of law to support the verdict. *See id.* at 1172. In *Karkaria*, the adolescent complainant alleged that her stepbrother raped her regularly between April 9, 1984, and September 19, 1984, while he was acting as her babysitter. *See id.* at 1167-68. The Supreme Court found the complainant's testimony was "riddled with critical inconsistences" and was so unreliable that it was insufficient as a matter of law to support the verdict. *Id.* at 1171-72.

Our Supreme Court went on to find the complainant's testimony unreliable because (1) the rape allegations suggested the complainant had an ulterior motive because they coincided with the pending reconciliation between the complainant's mother and stepfather, whom the victim disliked; (2) the complainant's description of the sexual assaults were "disturbingly vague" and she proffered only one factual scenario to describe the allegedly numerous assaults; and (3) the uncontroverted evidence contradicted the complainant's testimony regarding the timing of the assault, as she alleged the assaults only

happened when the defendant was babysitting her, but she admitted, and others testified, that the defendant no longer babysat the complainant and was rarely at the family home at the time the alleged assaults occurred. *See id.* at 1171.

However, just because there are inconsistencies does not necessarily make testimony unreliable; it must be so pervasive that it makes it impossible for the factfinder to arrive at a verdict to be based on other than surmise or conjecture. Moreover, the inconsistencies must be material, not related collateral matters, to make the evidence so unreliable that the factfinder cannot arrive at a verdict beyond a reasonable doubt as a matter of law. In this case, R.A.P. alleges the following makes E.B.'s testimony so inconsistent that as a matter of law it cannot support the verdict.

*a. The testimony regarding whether they engaged*
*in intercourse in 2017.*

R.A.P. essentially contends that the juvenile court erred when it did not accept that he and E.B. had engaged in sexual intercourse when they went out on a date in August 2017 because E.B.'s denial is contradicted by other witnesses who testified that E.B. admitted that she engaged in sexual intercourse with R.A.P. on that date. R.A.P. points to G.P.'s testimony that R.A.P. told him sometime in 2017 that he had intercourse with E.B. When G.P. asked E.B. whether what R.A.P. had told him was true, E.B. admitted that they had sex in the basement of R.A.P.'s home. He also points to B.G.'s testimony that stated that after E.B. alleged that R.A.P. raped her in April 2018, he asked her whether they ever had sex before that day and E.B. admitted to him that they had.

R.A.P. contends that reasonable doubt was raised because E.B. was not telling the truth regarding a sexual encounter that she allegedly had with him eight months before the incident in question, which calls into question her version of the events on April 18, 2018.

What that argument ignores is that there is no inconsistency in her testimony because the juvenile court found E.B.'s testimony credible that she did not have sex with R.A.P. in August 2018.

> The contradiction between the accounts of [B.G.] and [E.P.], on one hand, and [E.B.], on the other, about the prior sexual activity, does not prove that [E.B.] lied. [B.G.] and [E.P.], like [R.A.P.], are both male athletes and have known [R.A.P.] longer than they have known [E.B.]. Both described themselves as friends of R.A.P. Both were called as witnesses by R.A.P. Based on those relationships and the general demeanor of all three witnesses during the hearing, the Court gave more credence to the testimony of E.B.

(Juvenile Court Opinion, 5/22/19, at 9) (record citations and footnote omitted.)

What R.A.P. is really saying, though, is that the trial court should have accepted B.G. and E.P.'s testimony over that of E.B. in this regard. However, that ignores that credibility determinations are for the factfinder, not the appellate court on review. As the juvenile court noted, "A mere conflict in the testimony does not render the evidence insufficient because it is within the province of the fact finder to determine the weight to be given to the testimony and to believe all, part, or none of the evidence." *Commonwealth v. Walter*, 849 A.2d 265, 267 (Pa. Super. 2004).

### b. That E.B. obtained and supplied condoms on the evening in question.

R.A.P. contends that the juvenile court erred in accepting E.B.'s denial of supplying the condoms for their encounter in the bedroom that night and the denial that she ever had condoms in her room, as well as denying that B.G. had ever given her condoms at her request very shortly before that evening.

B.G. testified prior to April 2018 that E.B. asked him to get her condoms and that he supplied them to her. R.A.P. argues the fact that E.B. obtaining condoms prior to her encounter with R.A.P. is affirmative evidence that E.B. was anticipating having consensual, sexual relations with R.A.P., and that what happened in her home on the night of April 21, 2018, was not non-consensual, forcible rape.

He argues that the reasons given by the court for it to credit E.B.'s testimony that she did not receive condoms by the general demeanor of the witnesses, the fact that B.G. knew R.A.P. longer, that B.G. and R.A.P. were male athletes, and that R.A.P. called B.G. to the stand as reasons not to credit his testimony over E.B.'s denials are highly suspect because B.G. was a wrestler, not a hockey player, and the fact that he was summoned by the defense are improper reasons on their face to discredit his testimony.

Again, while R.A.P. believes that the juvenile court should have credited B.G. and himself ignores that it is for the juvenile court, as factfinder, "to determine the weight to be given to the testimony and to believe all, part, or none of the evidence." *Id.*

### c. Who initiated contact in 2018?

E.B. denied that she reinitiated the Snapchat conversations with R.A.P. in 2018. R.A.P. contends that he produced evidence that showed she was the one who reached out to him first. He contends that even though they never spoke at school, this purported inconsistency shows that E.B. wanted to have a relationship with him. However, even if material, what R.A.P. ignores is that he never established an inconsistency because he never proved her assertion untrue. As the juvenile court stated in addressing who initiated contact:

> [R.A.P.] next asserts that [E.B.] lied when she testified that it was R.A.P who sent a friend request to her on SnapChat, about a week before the incident. However, he never proved that that was untrue and that it was her who initiated contact with him. In support of his contention, he referred to Defendant's Exhibit "A." This exhibit represented a printout of a SnapChat text message from [R.E.P.] to a friend, Nina, containing a screen shot. The screen shot was of a SnapChat Menu, supposedly from [R.A.P.'s] phone, with [E.B.'s] name on it, under the heading "Added Me." (Ex. A.) In the Exhibit, [R.A.P.] has forwarded the screen shot to Nina, with the message "WTF I wanna know why she added me." (*Id.*) It was not only difficult for a layman to determine who initiated contact from an examination of this exhibit, it was problematic for an expert. In fact, the only social media expert called as a witness was Donald Lucas, who reviewed [R.A.P]'s phone and the exhibit, and testified that it was impossible to determine whether [R.A.P] friend-requested [E.B.] or [E.B.] friend-requested [R.A.P.].

(Juvenile Court Opinion, at 10-11) (record citations omitted).

### d. Where the assault(s) of 4/21/19 allegedly took place.

R.A.P. contends that there was an inconsistency in E.B.'s testimony that after some initial consensual kissing in the living room area of the house, R.A.P. then allegedly physically assaulted her in that room by forcibly taking down her leggings and inserting his fingers into her vagina and her mouth. E.B. admitted

that she had told police that nothing of that nature occurred downstairs at all. However, that is not an inconsistency but an omission presumably because she focused on the forcible vaginal and oral sex that occurred upstairs.

*e. How they got to the bedroom.*

R.A.P. next contends there is an inconsistency between E.B.'s claim that after the violent physical assault took place in the living room downstairs, she went upstairs to get him to leave and what she purportedly told the nurse, that she agreed to allow R.A.P. to see her room. Addressing this contention, the juvenile court rejected this allegation, stating:

> Juvenile's counsel apparently infers this from the report that [E.B.] said that "after sitting and talking for another X minutes, the suspect asked if he could see her bedroom." This may or may not be a fair deduction on his part. It is true that there is an indication in the nurses' notes that [E.B. "agreed" to allow [R.A.P] to see her room. This would appear to be in conflict with her testimony that he went up to her room without asking, and she followed him in order to ask him to leave. However, it must be kept in mind that there is a relatively low degree of reliability for these kinds of statements contained in medical reports. First of all, her alleged statement was not recorded. Secondly, the hospital representative who wrote down [E.B.'s] statements was not there to testify regarding the level of accuracy she attempted to maintain. Third, unlike a statement written by a witness or for a witness by law enforcement, there was no opportunity for [E.B.] to review the statement for correctness. Fourth, common sense would indicate that when a nurse takes a history in a sex assault case, the primary purposes would be to ensure that the physician examines the correct body parts and so that the physician can determine whether the physical evidence is consistent with the history. In this case, the portion of the history referred to by the Juvenile's counsel would have no bearing on the type of physical examination performed, and the physical examination would have no bearing on any determination as to whether that portion of the history was true. Therefore, it is possible that the note-taker did not use as much care taking this part of the history as he or she might have in describing the physical contact, as an example.

(Juvenile Court Opinion, at 13-14) (record citations omitted).

*f. The absence of physical evidence of a forcible assault.*

R.A.P. next contends that E.B.'s description of the assault that he violently pulled down her pants to penetrate her vagina, allegedly pushing her to the floor, re-entering her from behind as her face was on the carpet, then forcibly penetrating her again, and concluding with him forcibly compelling her to perform oral sex so violently that she was choking that there should have been both bodily and physical corroboration that occurred. He argues that her clothing would show rips, tears or other evidence of having been forcibly removed during an intense physical assault. He also contends that the Emergency Room physician testified that on the morning after the incident, there was no physical evidence of scratches, abrasions, redness or rug burns to any part of her face or body, and that there was absolutely no evidence of vaginal trauma.

At the outset, we note that physical evidence of force or medical evidence is not required for proof for any sexual offenses in the Commonwealth of Pennsylvania. **See Commonwealth v. Jette**, 818 A.2d 533, 534 (Pa. Super. 2003); **Commonwealth v. Minerd**, 752 A.2d 225, 227 (Pa. 2000). In disagreeing with R.A.P's contention, the juvenile court stated:

> In this case, Dr. Heather Walker, who examined [E.B.] on the day after the incident, testified that she reported "vaginal pain and throat pain" when she saw her. On physical examination, she found that there was tenderness to the left shoulder and chest on palpation, but there were no wounds, abrasions, or other objective signs of physical trauma. This lack of findings is not surprising, given [E.B.'s] description of the assault. [E.B.] had testified that during the assault, she had "closed her legs" screaming for him to stop, but she

never scratched, kicked, or hit him or did anything to push him away. Dr. Walker confirmed that she does not always make physical findings when there is a report of genital penetration.

(Juvenile Court Opinion, at 14-15) (record citations omitted). We also note that E.B.'s description of how R.A.P. took off her clothes would not necessarily result in their tearing or ripping.

*g. How long the incident in the home lasted.*

R.A.P. contends that the time period in which the alleged sexual assaults took place as measured by the message from E.B. to her mother at 9:01 p.m. stating that R.A.P. wanted to come into the house, until she responded to her mother's return message saying no at 9:14 p.m., was only 13 minutes. He infers that if that is true, then the events could not have taken place as E.B. contends. However, this argument is at odds with R.A.P.'s admission that all the sexual acts occurred within a ten-minute period.

*h. E.B.'s failure to turn over a key piece of evidence.*

Finally, R.A.P. contends that if E.B. was a victim of a violent sexual assault on that evening, her testimony is not reliable because she failed to voluntarily turn over her phone used for repeated contacts with R.A.P. He argues that while Snapchat messages may be difficult to recover, the phone may have contained other evidence to corroborate the version of events given by either party in this matter that could have shed critical light on disputed areas.

This is not a matter where E.B. refused to turn over the phone but involves the failure of R.A.P.'s counsel to subpoena it. As the trial court explained:

On July 9, 2018, the Juvenile's counsel filed a Motion for Discovery in which he sought to obtain from the Commonwealth the "Juvenile's cell phone and the cell phone(s) used by the alleged victim, together with passwords, usernames and any other phone records, to be delivered to Juvenile's attorney for the purpose of investigation of information regarding this case."

An oral argument on this Motion took place before the undersigned on July 13, 2018. Juvenile's counsel represented that he wanted the Commonwealth to turn over "two phones" (presumably his client's and [E.B.'s]) to him so that he could have an expert witness examine them. He was willing to pay his expert witness to determine whether there might be text messages or SnapChats between the two that would bear on the credibility of [E.B.]. The Commonwealth represented that it had possession of the Juvenile's phone but not the alleged victim's phone. The attorneys agreed to schedule a meeting of the experts so that they could review and examine the Juvenile's phone. However, the Assistant District Attorney maintained that she had no basis to obtain the victim's phone because the Commonwealth lacked probable cause. She did not want to violate the victim's Fourth Amendment rights and felt that the victim needed to have a civil attorney available to argue for her privacy rights before having to turn over the phone. The Court suggested that a solution would be for the Juvenile's attorney to issue a subpoena on the victim, requiring her to bring her phone to the meeting of the experts. The Court explained that this would permit the "victim [to have the] opportunity to come forward to object to it." If the victim did not object, then the Juvenile's attorney would have the phone. If the victim did object, the Court could schedule an argument or hearing to determine whether the objection was valid.

On July 13, 2018, the Court issued an Order requiring the parties to schedule a meeting of the experts. The Court further ruled that:

[t]he Commonwealth will not be required to seize the victim's telephone or bring the victim's telephone to the meeting of the experts. However, nothing in this Order will prevent the

- 25 -

Juvenile from issuing a subpoena on the victim or her guardian, directing her to bring that telephone to the meeting of the experts. If the Commonwealth or the victim objected to the subpoena, he, she, or they can make the appropriate request to the Court for review of that objection.

In the meantime, the victim was "not to destroy, alter, or modify the [victim's] phone in anyway, or to delete any information from the cellular telephone."

Experts for both sides ultimately met and examined the Juvenile's cellular telephone. They were not provided with the victim's phone or her mother's phone. In fact, it appears that the Juvenile's attorneys never served a subpoena upon the victim or her mother for the phones, as the Court had suggested. If they had, they may well have been permitted to provide the phone to the expert. If there was an objection, or the phone was not brought to the meeting, they could have asked the Court for relief, and if the Court denied it, they would certainly have had an appealable issue. Since they never issued a subpoena to obtain these cellular telephones, however, they should not be entitled to relief.

(Juvenile Court Opinion, at 15-17) (record citations omitted).

Accordingly, because there are no pervasive material inconsistencies in the Commonwealth's evidence, its evidence was sufficient to sustain the juvenile adjudication of delinquency.

## III.

R.A.P. next challenges the weight of the evidence supporting his sexual offense adjudications. The crux of his claim is that the juvenile court failed to recognize the inconsistencies in E.B.'s version of events and that it placed too much weight on the Snapchat message he sent to E.B. after the encounter, which it erroneously viewed as a categorical confession of rape. He avers that the court should have credited his testimony that the rape allegations were driven by his rejection of E.B.'s desire to have an ongoing relationship with him.

"A weight of the evidence claim concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the grounds that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice." ***In re A.G.C.***, 142 A.3d 102, 109 (Pa. Super. 2016) (citation omitted)  "Thus, we may reverse the juvenile court's adjudication of delinquency only if it is so contrary to the evidence as to shock one's sense of justice." ***Id.*** (citation omitted).  "Moreover, where the juvenile court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence." ***Id.*** (citation omitted).  "Rather, this Court is limited to a consideration of whether the juvenile court palpably abused its discretion in ruling on the weight claim." ***Id.*** (citation omitted).  "Hence, a juvenile court's denial of a weight claim is the least assailable of its rulings, as conflicts in the evidence and contradictions in the testimony of any witnesses are for the fact finder to resolve." ***Id.*** (citation omitted).

In the instant case, the juvenile court found the testimony of E.B. "compelling." (Juvenile Court Opinion, at 2).  It explained:

> She described the events in great detail, and in a convincing manner.  While there were some minor discrepancies between her testimony and the accounts she provided to detectives and hospital personnel, she was generally consistent.  Her friends, [S.G.] and [M.I.], who had both been sequestered, described her as being quite shaken when they picked her up shortly after the incident. . . .  [Their accounts were] largely undeviating from [E.B's] courtroom description.
>
> Conversely, the credibility of [R.A.P.] and his mother was questionable. . . .

- 27 -

(*Id.* at 2-3).

Although the court did find R.A.P.'s Snapchat message an important factor in its decision, it did so in conjunction with its credibility determinations, which weighed heavily in favor of E.B. The juvenile court also put the Snapchat message in context, reasoning:

> We [] know that [R.A.P.] testified that it was [E.B.] who pursued the sex at least as much as [R.A.P.], and he testified that it was [E.B.] who wanted the vaginal sex. So I asked myself, how would a normal person who has just engaged in consensual sexual intercourse react when wrongly accused of rape? The answer is that that person would likely be outraged and incensed. That person would likely deny the allegations. That person would likely call the accuser a liar. That person would likely contact the police and ask them to investigate false accusations. Instead, [R.A.P.] responded with a SnapChat text where he A. apologized for everything he put [E.B.] through; B. called [E.B.] a great person; C. apologized for hurting her physically and mentally; D. apologized for being horny[;] E. says he'll never lay a hand on [E.B.] again; F. admits that he effed up big time; G. says he can't express how badly he feels; and H. says "please talk back so we can work things out between us. No one else, just me and you [E.B.]." This is not the response of someone who's been falsely accused of rape. This is a response of someone who's practicing damage control.
>
> It is also noteworthy how [R.A.P.] responded when confronted with a copy of the SnapChat text by authorities on May 2, 2018. At 4:00 p.m. that day, [R.A.P.] was interviewed by Manor Police Officer Bob Kwiatkowski and Westmoreland County Detective James Mandarino. . . .
>
> * * *
>
> Near the end of the oral interview, [R.A.P.] was shown a copy of the text, which he admitted that he had sent [E.B] on April 21, 2018. Up to that point, when describing the incident, he had not reported any actions on his part that could have caused her pain or been construed as aggressive. Detective Mandarino testified that when confronted with the text, [R.A.P.]'s body language changed. [R.A.P.] admitted that he was surprised at this point. [He] was asked what he meant when he apologized for hurting her physically.

He responded that he hurt her during his attempt at vaginal sex, due to the size of his penis.  This explanation, however, makes no sense because he stated that he was never able to penetrate her.  He was then asked what he meant when he said he would never "lay a hand on" her again.  He then responded, for the first time, that he had put his hand on her head and pushed downward while she was providing oral sex.  He was then asked to provide a written statement, and his parents and he were given privacy to do so.  In the written statement, he did not repeat the dubious claim that he hurt her due to his penis size.  He did write that during oral sex, he "touched her head to go deeper, and she told [him] to stop so [he] stopped."  However, this part of the written statement was apparently added later, as this sentence was inserted with a caret.  [R.A.P.]'s actions when confronted with his text from the night of the incident cast further doubt on the veracity of his account.

(*Id.* at 6-8) (case citations omitted).

R.A.P. asks this Court to re-weigh the evidence and reevaluate the juvenile court's credibility determinations regarding E.B., who it found "compelling," and himself, who it found not credible, a task that is beyond our scope of review. *See In re A.G.C.*, *supra* at 109.  After review of the record, we conclude that the juvenile court did not palpably abuse its discretion in denying R.A.P.'s weight of the evidence claim and find that the evidence fully supports his sexual offense adjudications.  R.A.P.'s second issue merits no relief.

Dispositional order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/20/2020

- 29 -